IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| VALERO REFINING-TEXAS, L.P., | ) |
| And | ) |
| DIAMOND SHAMROCK REFINING AND MARKETING COMPANY, | ) |
| And | ) No. 03-1916C |
| | ) (Judge Firestone) |
| DIAMOND SHAMROCK REFINING COMPANY, L.P. | ) |
| And | ) |
| SUNBELT REFINING COMPANY, L.P. | ) |
| Plaintiffs, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

THE PARTIES

1. Plaintiff Diamond Shamrock Refining and Marketing Co. is a Delaware corporation. Plaintiffs Diamond Shamrock Refining Co., L.P. and Sunbelt Refining Co., L.P. are Delaware limited partnerships. Plaintiff Valero Refining – Texas, L.P. is a Texas limited partnership. Compl. ¶¶ 6-9. The plaintiffs are subsidiaries of Valero Energy Corp. ("Valero Energy"). Compl. ¶ 10. Valero Energy is a Fortune 500 company based in San Antonio with approximately 20,000 employees, revenues of nearly $30 billion, and assets of $14 billion. Valero Energy has an extensive refining system with a throughput capacity of almost 2 million

barrels per day. The company's geographically diverse refining network stretches from Canada to the U.S. Gulf Coast and West Coast. In combination with its interest in Valero L.P., Valero Energy has 4,800 miles of refined product and crude oil pipelines as well as refined product terminals, which complement its refining and marketing assets in the U.S. Southwest and Mid-continent regions. A marketing leader, Valero Energy has approximately 4,100 retail sites in the United States and Canada, branded as Valero, Diamond Shamrock, Ultramar, Beacon and Total. The company markets on a wholesale basis through a bulk and rack marketing network in 40 U.S. states, Canada and Latin America. See http://www.valero.com/.

2. The Defense Energy Support Center ("DESC") is a field activity of the Defense Logistics Agency ("DLA"), a component of the Department of Defense ("DoD"). 48 C.F.R. ("DFARS") § 202.1. Among other things, DESC (formerly called the Defense Fuel Supply Center, or "DFSC") purchases refined fuels for the military worldwide. Compl. ¶ 11.

**CONTRACT OVERVIEW**

3. DESC issues several annual requests for proposals ("RFPs") for hundreds of millions of gallons of various bulk fuel products. App. 2, ¶ 4. DESC evaluates the proposals and awards contracts to a number of companies each year, based upon the best prices to the Government. App. 4, ¶ 7. The contracts are typically indefinite quantity contracts with a term of approximately one year. App. 2, ¶ 4.

4. The contractors and DESC entered into at least 35 such contracts between 1985 and 1999, pursuant to which plaintiffs supplied "JP-4," "JP-5," and "JP-8" jet fuel, and "F-76" diesel fuel. Compl. ¶ 14; App. 1-2, ¶¶ 2-3.

5. JP-4 is a naphtha-based jet fuel that was used primarily by the Air Force and the Army. JP-5 and JP-8 are kerosene-based jet fuels. JP-5 is used by the Navy, and JP-8 is used

primarily by the Air Force and Army. F-76 diesel fuel is used by the Navy for ship propulsion. App. 2, ¶ 3; App. 46, ¶ 3.

6. The contracts were competitively awarded through negotiated solicitations, pursuant to 48 C.F.R. ("FAR") part 15 ("Contracting by Negotiation"), and, beginning in 1996, part 12 ("Acquisition of Commercial Items"). App. 2, ¶ 4.

7. The contractors delivered more than 1.25 billion gallons of fuel under the 35 contracts at issue here, for total payments in excess of $705 million. App. 2, ¶ 4.

8. The market values of crude oil and refined petroleum products change frequently. App. 47, ¶ 8. Because a single barrel of crude oil may be refined into many different commercial products, however, changes in the price of crude oil are not necessarily highly correlated with changes in the prices of refined products over the short term. Refining margins also can affect the correlation between prices of crude and refined products. Id. A barrel of crude oil constitutes the raw material for a wide variety of petroleum products sold in a multitude of competitive geographic and spot markets. Id. Prices in those markets are influenced by countless factors that affect supply and demand for the individual refined products. Id. Therefore, over any given time period, changes in the market prices of some refined products, made from a portion of a barrel of crude oil, may not correlate, in either direction or magnitude, with changes in the prices of crude, or of other products. Id.

9. Virtually all of DESC's fuel supply contracts are of the "fixed price with economic adjustment" variety, see FAR subpart 16.203, and, therefore, contain an economic price adjustment ("EPA") clause. App. 2-3, ¶ 5. DESC has used several versions of agency-drafted clause B19.33, "Economic Price Adjustment - Published Market Price." Id. Clause B19.33 is DESC's principal EPA clause. Id. DESC's general practice with regard to making

the FAR 16.203-3 determination to use an EPA clause is to include the determination in the acquisition plan for the solicitation. App. 3, ¶ 6.

10. The acquisition plan is maintained in what is known as the pre-award or solicitation file, because the plan applies to the solicitation as a whole. Id. Copies of the plan are not kept in individual contract files. Id. Acquisition plans for the following solicitations and contracts have been located:

| Solicitation | Contract(s) |
|---|---|
| DLA600-93-R-0161 | DLA600-94-D-0548, DLA600-94-D-0553 |
| SP0600-95-R-0061 | SP0600-95-D-0473, SP0600-95-D-0477 |
| SP0600-96-R-0061 | SP0600-96-D-0464 |
| SP0600-96-R-0161 | SP0600-96-D-0500 |
| SP0600-97-R-0061 | SP0600-97-D-0466 |
| SP0600-97-R-0161 | SP0600-97-D-0524 |
| SP0600-98-R-0061 | SP0600-98-D-0472 |
| SP0600-98-R-0161 | SP0600-98-D-0496 |
| SP0600-99-R-0058 | SP0600-99-D-0480 |
| SP0600-99-R-0061 | SP0600-99-D-0468 |

11. DESC began using EPA clauses in 1973, in response to increases in crude oil costs experienced by suppliers as a result of the Arab oil embargo. At that time, the Government had imposed controls upon the price of crude oil. After the price restraints were lifted, DESC gave suppliers the option of selecting an EPA clause based either upon actual crude oil costs, or upon market prices for similar products. In 1981, having concluded that allowing that choice presented too many administrative problems, including difficulties in evaluating and comparing bids that used different EPA types, DESC began using market-based prices exclusively. DESC chose a refined product market price publication because it was believed to closely mirror changes in refiners' costs, over time, although a given price publication might not track costs over shorter periods. See App. 50.

12. DESC's principal EPA clause (B19.33) listed prices for various refined products and regions taken from a commercially available market publication. See App. 58-60 (Contract DLA600-87-D-0608 at pp. 3-5, parts A and D). In part D, the EPA clause provided a unique "reference price" (sometimes called a "base reference price") for each refined petroleum product sought in the RFP. Id. at 60. An offeror would propose a "base price" for each product offered. That price was subject to adjustment, based upon changes in the reference price. The base price was primarily for proposal evaluation purposes. It was not expected to be the price the contractor received for fuel. App. 2-3, ¶ 5. EPA clause B19.33 provided that "[t]he prices payable under this contract for listed items shall be the base [bid] price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price increases or decreases per like unit of measure from the base reference price." App. 60 (part D(c)) (emphasis added). Thus, it may be said that each offeror's base price was "tied" to the reference price identified by DESC for that product. See id.

13. The EPA clauses in the contracts were different depending on when the contracts were awarded. For the 1985-1994 contracts, the price publication used to make price adjustments pursuant to DESC's EPA clause was the Petroleum Marketing Monthly ("PMM"). App. 4-5, ¶¶ 9-10. The PMM, published by the Department of Energy ("DOE"), Energy Information Administration, is a compilation of transaction prices in domestic petroleum markets. App. 4-5, ¶ 9; App. 46, ¶ 5. All refiners are required by law to submit sales data to DOE monthly. Id.; 15 U.S.C. § 772. DOE compiles the data and reports monthly average sales prices for various petroleum products, by region and by state, in the PMM. App. 4-5, ¶ 9; App. 46, ¶ 5. The PMM is considered a reliable indicator of average price movements. Id.

14. There is a three-month lag time for DOE to obtain the sales data and publish them in the PMM. Thus, for example, sales data for January are published in April, and data for February are published in May. App. 4-5, ¶ 9. Prices were adjusted monthly under the PMM-based EPA clause. Id. Because of the publication lag, interim adjustments were made monthly, subject to reconciliation when PMM data for that month were published. Id.

15. Beginning in 1995, the contracts included an EPA clause based upon regional average prices reported in a widely used industry publication, Platts Oilgram Price Report ("Platts"). App. 5, ¶ 10; App. 47, ¶ 6. Platts is published on weekdays. Id. Contract prices were adjusted weekly pursuant to DESC's Platts-based EPA clause, that is, contract prices remained in effect for one week. Id.

16. During performance of the contracts at issue here, the contractors never raised any question regarding the legality of the EPA clauses, and never complained that they were not being paid fairly. App. 6, ¶ 12. Nor did they ever object to any of the many price adjustments made under the contracts' EPA clauses. Id. In their proposals for each contract for which DESC's contract file still exists, the contractors expressly stated that they agreed to all terms and conditions. Id. Several of the contractors submitted offers continually during the period 1985-1999, and in later years. Id.

## THE FAR DEVIATIONS

17. In December 1992, this Court ruled, in MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992), superseded in part on reconsid'n, 30 Fed. Cl. 153 (1993), that DESC's EPA clause B19.33 was inconsistent with the FAR and, therefore, unauthorized.

17. In January 1993, DESC sought an individual FAR deviation to permit it to continue using its PMM-based EPA clause. App. 66-97. DESC said it was "in the middle of several major Bulk

Fuels Division acquisitions" and needed deviations to continue them. Id. at 66.

18. On January 14, 1993, Gary S. Thurber, DLA's Acting Executive Director (Contracting), granted an individual deviation for the use of the PMM-based EPA clause in contracts awarded pursuant to solicitation DLA600-93-R-0061. App. 98. Contract DLA600-93-D-0484 (App. 99-118) was awarded pursuant to this solicitation. App. 6-7, ¶ 15. On February 3, 1993, DLA granted an individual deviation for use of the clause in contracts awarded pursuant to solicitation DLA600-93-R-0062. App. 119. Contract DLA600-93-D-0492 was awarded pursuant to this solicitation. App. 120-33. In March 1993, DoD advised DLA that, because the Director of Defense Procurement ("DDP") had previously approved DESC's clauses, a class deviation was not needed. App. 134-135. A March 1993 letter from the DDP confirmed that the EPA clauses had "grandfathered" approval by the DDP. App. 136-1429. In 1992, the DDP had approved all DESC-drafted clauses then in use. Id. DESC later reconsidered and sought a class deviation despite the DoD advice (see below).

19. On September 6, 1994, DESC requested another individual deviation for a market-based EPA clause. App. 143-46. On November 15, 1994, Marilyn S. Barnett, DLA's Executive Director (Procurement), granted that deviation for contracts awarded under solicitation DLA600-95-R-0061. App. 144-47C. Contracts SP0600-95-D-0473 and SP0600-95-D-0477 (App. 148-167) were awarded under this solicitation. App. 7, ¶ 17.

20. In January 1995, DESC requested a "class deviation" authorizing the use of market-based EPA clauses, as well as a permanent revision to the DLA Acquisition Regulation ("DLAR") to expressly permit the use of such EPA provisions, notwithstanding any other FAR or DLAR provisions. App. 169-173. The request was directed to the Director of the Defense Acquisition Regulation Council, through DESC's Director of Procurement. Id. This request

resembled DESC's prior request for an individual deviation. DESC stated that, because the DLAR revision would "have a significant effect beyond the internal operating procedures of DLA and may have a modest impact on contractors and offerors," the proposal would be published for public comment in accordance with FAR 1.301(b), FAR subpart 5, and Section 22 of the Office of Federal Procurement Policy Act. App. 171.

21. On February 28, 1995, DLA published the proposed revision to the DLA procurement directive in the Federal Register, providing a 60-day comment period. App. 174-177. The Federal Register notice explained the proposed revision and set forth the proposed new language. DLA proposed to revise the regulation to expressly permit the contracting officer to use alternative EPA clauses, including clauses based upon commercial sales prices and established prices, without requiring that the prices be those of a specific contractor. Id.

22. DESC received only one comment concerning the proposed FAR revision. See App. 183, 186. The comment was submitted by the National Security Industrial Association. App. 181-182. The trade association did not object to the concept of market-based clauses, as such. Rather, it expressed concern that "the proposed regulation could, in certain circumstances, permit a contracting officer to select (or retain) an EPA reference that does not follow market prices." Id. at 181 (emphasis in original). DESC discussed the comment in a May 12, 1995, updated class deviation request. App. 183-187.

23. Also in February 1995, while its request for a class deviation was pending, DESC requested an individual deviation to allow it to use its Platts-based EPA clause in solicitation SPO600-95-R-0161. App. 188. On March 2, 1995, Col. Barry S. Wilson, DLA's Acting Executive Director (Procurement), granted that individual deviation. App. 189.

24. On October 5, 1995, Eleanor Spector, the Director of Defense Procurement ("DDP") granted DESC's request for a class deviation for the use of EPA clauses based upon "industry-wide and geographically based market price references . . . ." App. 190-191. She specifically authorized DESC to "deviate from the requirements of Federal Acquisition Regulation (FAR) 16.203-1 and 16.203-4 when using economic price adjustments on fixed-price contracts." Id. The DDP also approved a regulatory revision in the nature of a change to the DLA supplement to describe such market-based EPA clauses. Id. Contracts SP0600-96-D-0464, SP0600-96-D-0480, SP0600-96-D-0500, SP0600-97-D-0466, SP0600-97-D-0524, SP0600-98-D-0472, SP0600-98-D-0496, SP0600-99-D-0468, and SP0600-99-D-0480 were awarded pursuant to the class deviation and contain authorized EPA clauses. App. 192-230; App. 7, ¶ 16.

25. On August 2, 1999, the final rule revising DLAR subpart 5416.203 ("Fixed Price Contracts with Economic Price Adjustment") in accordance with DESC's 1995 request was published in the Federal Register. App. 178-180. There has been no Administrative Procedure Act challenge to the final rule.

## VALERO'S CLAIMS

26. Plaintiffs submitted certified Contract Disputes Act claims regarding their 35 subject contracts on August 9, 2002, September 9, 2002, September 13, 2002, December 4, 2002, and April 2, 2003. Compl. ¶¶ 29-32; App. 6, ¶ 13. Plaintiffs requested total additional compensation of approximately $128.2 million. App. 6, ¶ 13. Their principal contention was that the EPA clauses in their contracts were illegal, citing the MAPCO decision. Id. App. 231-289 (claim example).

27. To price their claims, plaintiffs calculated the alleged "fair market value" of their products by starting with the spot market price of a comparable product, and added a "long-term contract premium," and transportation costs. App. 251-253.

28. The contracting officer denied plaintiffs' claims in a final decision dated June 30, 2003. App. 290-299. The contracting officer concluded, among other things, that the EPA clauses are authorized and enforceable, and that the constructed, "Platts-plus" prices calculated in the claims do not reflect fair market value. Id.

29. In the alternative, the contracting officer asserted the following Government claim:

> [I]f Diamond Shamrock's contracts are re-priced [as the result of litigation], the Government asserts a claim against Diamond Shamrock in the amount of $2,099,939 for the recovery of net unauthorized payments under the contracts.

App. 297.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Senior Trial Counsel
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

BERNARD A. DUVAL
Chief Counsel
HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

October 21, 2003

CERTIFICATE OF FILING

I hereby certify that on October 21, 2003, a copy of foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham