IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| VALERO REFINING-TEXAS, L.P.,<br><br>And<br><br>DIAMOND SHAMROCK REFINING AND MARKETING COMPANY,<br><br>And<br><br>DIAMOND SHAMROCK REFINING COMPANY, L.P.,<br><br>And<br><br>SUNBELT REFINING COMPANY, L.P.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 03-1916C<br>(Judge Firestone) |

**JOINT STATUS REPORT**

Pursuant to the Court's May 10, 2005 Order, Plaintiff, Valero Refining-Texas, L.P., Diamond Shamrock Refining and Marketing Company, Diamond Shamrock Refining Company, L.P., and Sunbelt Refining Company, L.P. (collectively "Valero"), and Defendant, the United States, respectfully submit the following Joint Status Report addressing the course of further proceedings in this matter. The parties set forth their respective positions separately, below.

## I. Valero's Position

In its May 10, 2005 Order, the Court stayed proceedings pending a final ruling by the United States Court of Appeals for the Federal Circuit in the similarly situated case of *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, *petition for reh'g en banc denied*, No. 04-5064

(Fed. Cir. Aug. 22, 2005). In *Tesoro*, the Federal Circuit addressed one of the several grounds for relief Valero also advances here – namely, whether the military fuel prices the Defense Energy Support Center ("DESC") set using the Petroleum Marketing Monthly ("PMM") "were *per se* illegal" because "prices could only be adjusted based on changes in the individual contractor's prices." *Id.* at 1342, 1344.[1] The Federal Circuit answered that question in the negative, stating that "DESC's use of market-based references to determine adjustments to established prices was authorized under the law." *Id.* at 1348. Accordingly, it is now appropriate for this Court to lift the stay here and for Valero to proceed on its other grounds for recovery.

Upon lifting of the stay, Valero intends to file a Second Amended Complaint reflecting the substantial additional evidence Valero has obtained between the time Valero filed its original Complaint and the Federal Circuit's ruling in *Tesoro*.[2] Much of this additional evidence was made available to Valero as a result of initial discovery from DESC in other similarly situated cases.

---

[1] In *Tesoro*, Plaintiffs-Appellants, in their principal brief, delineated the issue before the Federal Circuit as follows: "Tesoro's and Hermes' Complaints contain seven counts; however, only the portion of Count I alleging *per se* illegality was the subject of the parties' cross motions [for summary judgment below] and therefore within the scope of this certified appeal." (Brief of Plaintiffs-Appellants at 8 n.5 (citing *U.S. Philips Corp. v. Sears Roebuck & Co.*, 55 F. 3d 592, 597 (Fed. Cir. 1995)). Similarly, DESC, in its principal brief, stated the issue before the court as follows: "Whether the parties to a Government fuel supply contract that contains an economic price adjustment ("EPA") clause are prohibited from agreeing to adjust the contract price based upon changes in the market price for fuel." (Brief of Defendant-Appellee at 1).

[2] RCFC 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires."

### A. Valero's Additional Evidence

Some of the additional evidence Valero obtained since filing its original Complaint includes:

1. A January 5, 1993 memorandum from the Deputy Director, Directorate Contracting and Production, states that the purpose of DESC's PMM-based price adjustment clause was to (1) "ensure[] that the contract price will be awarded and remain at the market price," and (2) "ensure[] that the sale will be at the market price, which is fair and reasonable." As the evidence cited below establishes, PMM did neither. [3]

2. As early as January 1986, DESC concluded in an internal assessment that "the movement of PMM as compared to other [market] references . . . indicates that the PMM may have moves as much as one or two cents per gallon out of step with such . . . references." (Emphasis added.) In contrast, DESC typically required suppliers such as Valero to submit bids to sell military fuel broken out to the one-ten-thousandth of a cent ($.000001). DESC did not disclose to its suppliers such as Valero its 1986 assessment and, notwithstanding the assessment, continued to use PMM in its price adjustment clause.

3. In 1987, DESC conducted another study of PMM which found that PMM did not protect against market fluctuations and did not ensure that the prices DESC paid it suppliers for military fuel reflected at least fair market value. DESC did not disclose this 1987 study to its suppliers such as Valero and, despite the study, continued to use PMM in its price adjustment clause.

4. Seven years later, in 1994, senior officials at Defense Logistics Agency ("DLA"), of which DESC is a part, learned of DESC's 1987 study. Upon review of the study, DLA directed DESC to stop using PMM to set military fuel prices.

5. In implementing DLA's directive to stop using PMM, DESC admitted that its use of PMM had distorted military fuel prices

[3] DESC was one of the principal users of PMM and worked with the Department of Energy ("DOE"), PMM's compiler, in determining how PMM was published. A March 23, 1989 internal memorandum from DESC's Director, Office of Market Research and Analysis, states: "DOE normally will work with us to see that our needs are satisfied as we are one of the primary users of the PMM." DESC never disclosed to its suppliers such as Valero its role in publication of PMM.

materially, stating in internal documents that "direct contract price comparisons are not possible" between the prices DESC established using PMM and what DESC determined to be fair market value.

6. Consistent with DESC's internal admissions, a DOE report admits that PMM differed by as much as nineteen percent from comparable prices published by the Bureau of Labor Statistics.

7. Among the many inadequacies of PMM for use in setting military fuel prices, PMM suffered from a statistical flaw known as an "index number problem," whereby different categories or classes of fuel were used to calculate the value of PMM in different months. Such an index number problem renders use of PMM essentially meaningless for comparing changes in price levels from one month to the next, as DESC did.[4] After this case was filed, and after a Rule 30(b)(6) deposition of DOE was taken in a similarly situated case, DOE publicly conceded that PMM suffered from an index number problem.

8. In DESC's procurements, more than fifty percent of the fuel offered (as a percentage of fuel purchased) was commonly subject to an auction prohibited by law and regulation, whereby DESC awarded contracts to a bidder willing to agree to meet the price, or adjusted price, of another bidder.[5]

9. In some years, more than twenty percent of the fuel offered (as a percentage of fuel purchased) was subject to DOD's ten percent price preference for suppliers owned by minorities or socially disadvantaged individuals. In *Rothe Development Corp. v. DOD*, 324 F. Supp. 2d 840 (W.D. Tex. 2004), the court held that, prior to 1998, DOD's ten percent price preference was facially unconstitutional because it violated the equal protection component of the Fifth Amendment's due process clause. The government did not appeal this holding before the Federal Circuit.

---

[4] By way of illustration only, if DOE calculated PMM based on the price of commercial jet fuel in one month and then calculated PMM based on the price of military jet fuel (which differs materially in price from commercial jet fuel) in the next month, the change in the level of PMM would be meaningless for measuring the change in the price of either commercial or military jet fuel. The statistical flaws in the PMM are, in fact, more complex than in this example; however, the net effect is essentially the same.

[5] See, *infra*, note 17 for a discussion of how DESC's illegal auction damaged Valero.

> *Rothe Development Corp. v. DOD*, No. 04-1552, 2005 U.S. App. LEXIS 12,748, slip op. at *6 (Fed. Cir. June 28, 2005).[6]

Thus, as this and other evidence establishes, DESC set military fuel knowing that its prices did not reflect at least fair market value and were not fair and reasonable.

### B. Valero's Second Amended Complaint

Valero's Second Amended Complaint (hereinafter "Amended Complaint"), a draft of which is attached hereto as Exhibit A, reflects this and other additional evidence Valero has obtained since filing its original complaint. As explained further below, the Amended Complaint contains the same seven counts that were set forth in its original Complaint; however, based on the additional evidence obtained, the grounds for the counts are stated more fully.

#### 1. Count I

Count I of the Amended Complaint alleges illegality. Count I more fully draws the distinction between *per se* illegality, which the Federal Circuit denied in *Tesoro*[7], and illegality "as applied." Thus, Valero alleges that, even if DESC were permitted to use PMM or other indexes to set prices, the indexes DESC used were not in fact representative of the marketplace

---

[6] While the lower court characterized its holding as granting an "as applied" challenge to DOD's price preference, 324 F. Supp. 2d at 849, 860, the Federal Circuit properly characterized the lower court's decision as having held that the price preference was "facially unconstitutional." Slip op. at *6. See, *infra*, note 18 for a discussion of how DESC's minority price preferences damaged Valero.

[7] Valero reserves the *question* whether the Federal Circuit's holding in *Barrett Refining Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001), that DESC's price adjustment clause was illegal controls over the Federal Circuit's later, conflicting decision in *Tesoro*. *See generally Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc . . . Where there is direct conflict, the precedential decision is the first."). Valero also reserves the question whether *Tesoro* was wrongly decided. However, Valero recognizes that resolution of these questions may have to await further appellate consideration.

for fuel and therefore did not comply with the requirement of FAR § 16.203 that they be "market-based." *Tesoro*, 405 F.3d at 1348.

In *William Alaska Petroleum, Inc. v. United States*, No. 02-705C (Fed. Cl.), the Court articulated this illegality "as applied" claim by distinguishing it from a claim of *per se* illegality:

> I thought the situation is one in which the question was may the government use[] a market-based-index, and I said of course it can. . . . But that says nothing about . . . whether the index provides an accurate measure of the market it's attempting to draw data from.
>
> If, for example, it was an index of apples and orange and bananas, no one could conceivably argue, well, it's there in the contract and therefore it's law. No. You may have a right to use a market-based index, *but the index itself must be representative of the market it's purporting to represent.* That's the issue that I see is still there to be decided.

(Transcript of Nov 18, 2003 Proceedings at 24-25 (emphasis added).) Consistent with the Court's characterization in *Williams*, the parties here have not yet developed the record concerning whether the indexes DESC used to set prices properly reflected the market value for fuel or, therefore, whether those indexes complied with FAR § 16.203.[8]

Beyond the issue of whether DESC's indexes complied with FAR § 16.203, Valero more specifically alleges in Count I that DESC's military fuel prices violated FAR § 15.802(b) [currently codified at FAR §15.402(a)]. This provision required that DESC award contracts with "fair and reasonable prices." Valero alleges, and its new evidence corroborates, that DESC did

[8] In *Tesoro*, DESC conceded before the Federal Circuit that the issue whether PMM properly measured market value was not before the court. In its principal brief in *Tesoro*, DESC responded to criticisms of the *amicus* The American Petroleum Institute about the "'suitability' and 'appropriateness'" of PMM as a measure of market prices, stating: "we do not regard this appeal as a referendum upon the appropriateness or suitability of particular price references – especially not with conflicting affidavits on that point." (Brief of Defendant-Appellee at 25.) Furthermore, in its response to the Petition for Rehearing *En Banc* in *Tesoro*, DESC implicitly conceded that the relationship between PMM and the marketplace was not before the court, stating that the Appellants "offer no analysis of the PMM reference prices used in these cases." (Response of the United States to the Petition for Rehearing *En Banc* at 14 (emphasis original).)

not do so. Finally, in Count I, Valero sets forth more fully based on its additional evidence its allegations that DESC conducted an illegal auction for contracts and awarded contracts based on an illegal price preference for minority-owned firms.

### 2. **Count II**

In Count II of the Amended Complaint, Valero alleges that DESC misrepresented and otherwise failed to disclose material facts when it awarded and administered the military fuel contracts. Valero alleges, *inter alia*, that DESC: (1) misrepresented that the indexes it used to set prices were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for fuel reflected at least fair market value; (2) misrepresented that its military fuel prices reflected at least fair market value and were fair and reasonable; (3) misrepresented that it was not involved in publication of PMM; and (4) misrepresented that its military fuel prices were legal.

### 3. **Count III**

In Count III, Valero alleges that DESC breached the parties' fuel contracts. Valero alleges that DESC breached its contractual obligations, *inter alia*: (1) by setting prices using indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for fuel reflected at least fair market value; (2) by setting prices that did not reflect at least fair market value and were not fair and reasonable; and (3) by failing to negotiate the contracts in good faith and instead using a "non-negotiable" price adjustment clause that DESC knew did not provide for payment of fair market value.

### 4. **Counts IV to VII**

In Count IV, Valero alleges that DESC's violations of law alleged in Count I give rise to an implied-in-fact contract to pay fair market value. In Count V, Valero alleges that DESC's

actions and omissions giving rise to breach of contract in Count III (e.g., its failure to use indexes adequate to accomplish the stated purposes of its price adjustment clause, and its failure to set prices that reflect fair market value) also caused material conditions of the contracts to fail and therefore support claims for failure of consideration and frustration of purpose. Alternatively, as set forth in Count VI, Valero alleges that these same actions and omissions were the product of a mutual mistake of the parties. Finally, in Count VII, Valero alleges, in part based on DESC's violations of law, a taking under the Fifth Amendment.

### C. Discovery Schedule

As set forth above, Valero's claims clearly raise factual issues upon which discovery is required. The additional evidence Valero obtained as part of initial discovery from DESC in other similarly situated cases makes clear that DESC possesses a wealth of information relevant to this case. Accordingly, Valero proposes the following discovery schedule:

1. Discovery shall begin immediately. The requirements for disclosure in Rule 26(a), the limitations on the number of depositions in Rule 30(a)(2)(A), and the limitations on the number of interrogatories in Rule 33(a) shall not apply.

2. After one year of discovery, the parties shall exchange expert witness reports. Three months shall be allowed for expert witness depositions and associated discovery.

3. Within three months of completion of expert witness depositions, the parties shall submit any responsive expert witness reports. To the extent requested by either party, depositions concerning responsive expert witness reports shall be completed within three months.

Previously, the government agreed to and this Court adopted an essentially identical discovery schedule in other similarly situated cases prior to the interlocutory appeal in *Tesoro*.[9]

[9] *See, e.g.*, Status Report at 1-2 (May 6, 2003) (*La Gloria Oil and Gas Co. v. United States*, No. 02-465C (Fed. Cl.)); Order at 1-2 (May 7, 2003) (*La Gloria Oil and Gas Co. v. United States*, No. 02-465C (Fed. Cl.)).

## II. Defendant's Position

The Federal Circuit has held that the escalation clause at issue here, including its use of the Petroleum Marketing Monthly ("PMM") as a reference, was legal in all respects. Tesoro HI Corp. v. United States, 405 F.3d 1339 (2005). Valero now attempts to minimize the centrality of illegality to its claims. Yet, as reviewed below, the viability of even the claims set forth in Valero's proffered amended complaint depends fundamentally upon the rejected allegation of illegality. Accordingly, defendant proposes to file a dispositive motion and would be happy to discuss the grounds for such a motion in detail at a status conference.[10]

Valero's central claim, still present in the proffered amended complaint, is that the contracts violated FAR 16.203-3. This was rejected by the court of appeals.[11] The remaining claims fall into three broad categories: (1) allegations of violations of law in contract formation; (2) allegations that Valero's expectations were not met in performance of the contracts; and (3) a takings claim. The Court should promptly dispose of all of them upon our motion.

### A. Contract Formation Counts

The Category 1 claims are asserted in Count 1. There, Valero alleges that (i) the Government's use of the PMM and other EPA clauses violated FAR 15.802(b) (currently 15.402(b)), an allegation that was not contained in the claims to the contracting officer or the original complaint; (ii) DESC violated the Office of Federal Procurement Policy ("OFPP") Act, 41 U.S.C. § 423, and implementing regulations, by awarding the contracts via illegal auctioning

---

[10] We see no value in addressing the various pieces of "additional evidence" cited by Valero. Suffice it to say our dispositive motion will demonstrate that the allegations are all unfounded or irrelevant. Of course, in response to our motion, Valero could pursue an RCFC 56(f) motion for additional discovery.

[11] To the extent Valero disagrees with Tesoro, its sole recourse is to seek further appellate review, not to ignore the court's holding.

techniques, at least after July 16, 1989; (iii) DESC violated Part 219 of the Department of Defense FAR supplement ("DFARS") by improperly soliciting and awarding contracts set aside for small and small disadvantaged businesses; and (iv) DESC violated the Constitution's Equal Protection Clause by extending bidding preferences to minority-owned businesses that were not narrowly tailored to further a compelling Government interest.

In addition to our specific responses below, the bases for Valero's arguments in Counts ii-iv above were apparent on the face of the solicitations and should have been raised before the close of bidding. Valero's failure to timely protest precludes it from raising these issues now, many years after the contracts were awarded and performed. North Carolina Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 165-66 (2002).

FAR 15.402(b), which requires the Government to award contracts at fair and reasonable prices, is a bar only against overpayment. See All Phase Environmental, Inc., B-292919.2, 2004 CPD ¶ 62. Otherwise, no contract would be binding and contractors could routinely file and litigate claims that "the price was unfair." Valero seeks to void the terms in its numerous agreements providing that it would be paid its bid price plus an adjustment, and seeks, instead, payment of something it calls "fair market value." However, Valero neither defines that term nor identifies any source of law that entitles it to be paid anything other than the contract price. That is not surprising, as Valero never – during performance of the contracts, during its continued, successful efforts to win more contracts, or even in its certified claim – complained that the prices were simply unfair. Indeed, this belated request for the Court simply to reprice these ancient contracts without legal underpinning or standards underscores how free-floating Valero's theory is, and why it must be tested by a dispositive motion.

Valero's OFPP claim is that DESC's small business set-aside program violates the restriction upon disclosing proprietary or source selection information. 41 U.S.C. § 423(b)(3). Similarly, its DFARS Part 219 claim alleges that, in awarding partial small business set-asides, DESC failed to properly solicit or re-solicit large businesses. Both claims rest upon Valero's characterizations of the program, which are mistaken. These claims are unlikely to involve disputed evidence and it is difficult, in any event, to see how Valero, a winning bidder, could have been "harmed in [a] concrete way contemplated by the FAR." See LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1556 (Fed. Cir. 1995).

Valero's equal protection claim is grounded in Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995), which held that racial preferences in Federal contracting are subject to strict scrutiny. This claim fails because the Equal Protection Clause is not money-mandating and "do[es] not trigger Tucker Act jurisdiction in the courts." Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988). (Adarand was an action for injunctive relief brought in a district court.) Even if not dismissed, the Adarand claim raises only legal issues and it appears that, as a successful bidder, Valero suffered no actionable harm.

**B. Contract "Performance" – (Counts 2 Through 7)**

The Category 2 counts are all based upon the allegation in Count 1 that the pricing clauses were illegal. For example, in Count 2 (Misrepresentation), Valero alleges that the Government misrepresented the contracts as complying with law and that the price publications referenced in the EPA clauses were not intended for that purpose. However, the Federal Circuit has ruled that the contracts were legal, and Valero's post hoc critique of the price publications cannot render the use of those publications "illegal," or form a basis for a misrepresentation claim. The complaint does not even allege, in any event, who misrepresented what to whom or how Valero, a sophisticated oil company, could have been confused about the price publications.

Count 3 (Breach of Contract) is virtually identical to Count 2. Count 4 (Implied in Fact Contract), meanwhile, appears to state a theory of remedy when price terms are stricken from a contract. That theory, however, is irrelevant, inasmuch as the price terms are legal and cannot be stricken. Moreover, the internal Government documents cited by Valero simply do not establish the mutual intent necessary to create an implied contract. See D&N Bank v. United States, 331 F.3d 1374 (Fed. Cir. 2003).

Count 5 (Failure of Consideration and Frustration of Purpose) alleges that DESC's violation of law constituted a material breach of contract, and that flaws in the price publications caused a failure of consideration. However, the Federal Circuit has found that DESC did not violate the law, so there was no breach. We frankly cannot understand the consideration argument, but it appears to be purely legal.

Finally, Count 6 (Mistake) essentially mirrors Count 2 by alleging a purportedly mistaken "intent" that the contract's references to price publications would result in legal and fair prices. This does not state a cause of action. First, the Federal Circuit has declared the contracts legal. Second, a mistake claim requires proof of a mistaken belief about an existing "fact" that was essential to the bargain. "A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake'" of that nature. Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (quoting Restatement (Second) § 51). Predictions about how prices might develop are not "facts" susceptible to "mistake," and it is impossible to believe that sophisticated oil producers misunderstood the price publications, in any event. The parties relied upon their own analyses to determine whether the clauses at issue made business sense. Given Valero's many years of experience with the escalators – and its failure to complain about the

years of payments it collected thereunder – there is no prospect that it can prove a material mistake.

### C. Taking

Count 7 should be promptly dismissed because, now that the Federal Circuit has held that the EPA clauses to which Valero agreed were authorized, there is no room to allege that the Government took fuel without paying just compensation. See, e.g., Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978).

### D. Conclusion

At bottom, Valero's theory of recovery appears to be that DESC should have used different escalators,[12] although we have no idea why, or which ones, or upon what legal theory Valero may now challenge a legal clause years after contract formation.[13] Whether to use one market-based EPA clause or another was within DESC's business discretion. Alleged differences among escalators, which is the general tenor of Valero's evidentiary snippets, does not establish an abuse of discretion. Indeed, nothing Valero has proffered or alleged suggests that the choice of the PMM as a market reference over many years rose to the level of illegality. Accordingly, nothing precluded Valero from agreeing to the terms offered, and it is bound by its choice.

To the extent that Valero is complaining not that the DESC clause was illegal per se, but somehow acted inconsistently with contract standards, then it was obliged to document that fact and present a claim upon that basis to the contracting officer. It has not done so. Therefore, the

[12] The "evidence" Valero cites primarily relates to PMM. Valero used Platts to price its own claim.

[13] In that regard, this case differs from Beta Systems, Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988), where relief was predicated on an EPA clause that failed to comply with the applicable Defense Acquisition Regulation provision.

Court may not entertain any such claim now.[14] Finally, the court should deny Valero's request for additional discovery. The Government has produced tens of thousands of pages of documents in the years of EPA clause litigation. As Valero's list of "[a]dditional [e]vidence" amply demonstrates, Valero has been a direct or indirect beneficiary of those efforts. We know of nothing left to produce. In any event, given that we request a schedule for a motion to dismiss, discovery is inappropriate.

We have reviewed Valero's "reply" below, and we submit that it demonstrates – by its length, if nothing else – that full briefing is warranted. Briefing is undeniably preferable to continuing to debate the merits of the case in a status report.

## III. <u>Valero's Reply</u>

DESC seeks to avoid any discussion or discovery of the evidence showing that DESC knew that its indexes did not reflect fair market value but used them to set prices anyway. Instead, DESC proffers a dispositive motion that, on its face, is not well-founded and ignores or misstates the better part of Valero's complaint.

DESC reaches beyond its grasp in asserting that *Tesoro* precludes Valero's illegality as applied claim because the Federal Circuit found that DESC's prices were "legal in all respects." DESC cannot credibly maintain that the Federal Circuit held, in the absence of any record, that DESC's prices were legal even if DESC knew that its indexes were not "market based" and used them anyway. *See Tesoro*, 405 F.3d at 1343. These are issues DESC previously conceded were not before the Federal Circuit, and DESC may not now be heard to argue that the Federal Circuit

[14] We would not expect there to be such evidence, because, as we established earlier in this litigation, Valero never complained. Moreover, because the PMM is comprehensive, composed not of a sample but of all the data of all suppliers legally mandated to supply data, it is very difficult to imagine how, month after month and year after year, the data could always be wrong.

decided them in its favor. (See note 8, *supra*.)[15] Furthermore, DESC's assertion that this Court cannot review, even for an abuse of discretion, DESC's knowing and false certification of price reasonableness under FAR § 15.802(b) is not consistent with the law,[16] nor is DESC's defense of its illegal auction[17] and minority price preferences.[18]

---

[15] Moreover, even if the Federal Circuit somehow could be deemed to have found that the indexes DESC used in *Tesoro* to set prices in Hawaii, Alaska and Wyoming reflected market value in those markets, DESC fails to explain how those findings could be applied to other markets in other parts of the country such as those at issue in this case. Nor does DESC explain how, consistent with due process, third parties such as Valero here, with the right to present their own factual record in their own cases, could be bound by the Federal Circuit's alleged factual finding in a different case.

[16] *See, e.g., McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (referring to judicial review pursuant to "the well established law governing abuse of discretion by a contracting official"); *LaBarge Products v. West*, 46 F.3d 1547, 1555 n. 6 (Fed. Cir. 1995) (contracting officer's discretion to request a second round of best and final offers limited by the requirement of the FAR that "it is clearly in the government's interest"). Moreover, DESC errs in asserting that Valero did not challenge the fairness and reasonableness of DESC prices in its claims to the contracting officer. At its core, Valero's claims asserted that Valero was not paid fair market value for fuel. It is difficult to imagine a more direct challenge to the fairness and reasonableness of DESC's prices. Additionally, it is the operative facts, not the violation of every conceivably implicated statute or regulation, that a Contract Disputes Act claim must place at issue to support a complaint in this Court. *See Cerberonics, Inc. v. United States*, 13 Cl.Ct. 425, 417 (1987).

[17] DESC does not deny that it conducted an auction. Instead, DESC asserts that Valero's characterization of DESC's program is "mistaken," while at the same time making the contradictory assertion that "the claims are unlikely to involve disputed evidence." At a minimum, Valero's illegal auction claims cannot be meaningfully addressed until discovery establishes specifically who at DESC disclosed which supplier's bid prices to whom, when the prices were disclosed, and with what result.

DESC's further assertion that its illegal auction did not harm Valero is too quickly made, particularly when the very purpose of the auction is alleged to be to obtain lower prices. By way of illustration, if DESC is willing to award a contract to a small business if the small business matches the price bid by a large business, then the large business, knowing this fact and seeking to win the contract, must bid a price low enough that the small business will not accept the award at the match price. The large business is thereby compelled to bid lower than it otherwise would have in order to win the contract, a fact well-known to DESC.

[18] DESC proffers as a sole defense to its minority price preferences (preferences DOD admitted were unconstitutional in *Rothe Development*) that the equal protection component of the Fifth

DESC misstates the facts when it seeks to preclude discovery on the grounds that Valero's allegations of misrepresentation, breach of contract, failure of consideration,[19] and mistake are premised only upon allegations of illegality. Thus, in Count II, while Valero alleges that DESC misrepresented its violation of law and regulation, Valero also alleges that:

> 61. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that it based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.
>
> 62. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value.

---

Amendment's due process clause is not money-mandating. This assertion misses the mark. For purposes of establishing jurisdiction under the Tucker Act, Valero properly alleges "a claim against the United States founded upon . . . any express or implied contract," albeit an illegal contract. 41 U.S.C § 1491(a)(1). Valero is no more required to show that the law DESC violated was itself money-mandating than were the plaintiffs in innumerable other cases where relief from an illegal contract was found to be available. See, e.g., *LaBarge*, 46 F.3d 1547; *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988).

DESC's assertion that Valero could not have been harmed by its minority price preferences similarly fails. If DESC is willing to award a contract to a minority firm if its bid is within ten percent of the price bid by a non-minority firm, the non-minority firm, knowing this and seeking the award, must bid more than ten percent below what it believes the minority firm will bid. The non-minority firm is thereby compelled to bid lower than it otherwise would have to win the contract, once again a fact well-known to DESC.

[19] In response to DESC's assertion that it "cannot understand the consideration argument," Valero cites CORBIN ON CONTRACTS, which explains that failure of consideration occurs where "[t]he duty to perform a promise subject to an express or implied condition [is] discharged by the promisor's failure to receive the agreed equivalent for the promised performance." CORBIN ON CONTRACTS § 68.4. Failure of consideration may occur "even though no breach of contract occurs" and entitles "the disappointed party a right to restitution of . . . benefits already conferred." *Id.* Valero alleges, *inter alia*, that DESC failed to provide the agreed equivalent for Valero's supplying fuel, namely the payment of fair market value. Amended Complaint paras. 100-03.

> 63. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that the contracts did not provide for payment of at least fair market value for military fuel and did not provide for fair and reasonable prices.
>
> 64. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that DESC worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

Amended Complaint paras. 61-64.

None of these allegations is even remotely premised upon illegality, and analogous averments are set forth in Valero's allegations of breach of contract, failure of consideration, and mistake. Amended Complaint paras. 75-78, 100-03, 120-22.[20] DESC states no meaningful basis upon which it intends to move for dismissal of these extensive and detailed allegations, nor does DESC articulate a reason why Valero is not entitled to discovery concerning them.

Finally, DESC asserts that, because Valero did not file a bid protest before entering the contracts, Valero waived its allegations of illegality. The Federal Circuit rejected this assertion in *LaBarge*, 46 F.3d at 1552-53. Moreover, waiver takes on a different character where, as currently at issue here, the underlying illegality is alleged to be the product of misrepresentation or mistake concerning the underlying facts. *See generally Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988). Thus, for example, with respect to Valero's illegality as applied claims, DESC's misrepresentation (or the parties' mistake) concerning whether DESC's indexes

---

[20] DESC similarly missteps in asserting that Valero does not allege a mistake with respect to an existing fact when the contracts were entered. Contrary to DESC's assertion, Valero alleges, *inter alia*, that the parties were mistaken concerning whether DESC's indexes were designed or intended to report changes in fair market value, whether DESC's indexes in fact reflected fair market value when the contract was entered, and whether DESC's indexes suffered undisclosed design deficiencies such as an index number problem. Amended Complaint paras. 19, 120-22. These are classic allegations of factual mistake with respect to which Valero is clearly entitled to discovery.

were "market-based" precluded a knowing waiver of the law, even assuming such a waiver of law could occur.

Waiver is equally inapplicable to Valero's other claims. Valero's allegations of misrepresentation and mistake of fact in Counts II and VI are not susceptible to a waiver defense (and certainly not prior to discovery), because the presence of misrepresentation or mistake precludes the voluntary relinquishment of a known right.[21] With regard to Valero's allegations of breach of contract in Count III, it is well established that a material part of the consideration for a contract (here the payment of fair market value) cannot be waived in the absence of additional consideration, which DESC does not allege.[22] Similarly, where a contract falls for failure of consideration, as Valero alleges in Count V, there are no underlying obligations left to be waived.[23] Accordingly, because DESC's proffered waiver defense is inextricably linked to

---

[21] *See* Joseph Perillo, CALAMARI AND PERILLO ON CONTRACTS at 458 (5th Ed. 2003) ("The party waiving must know or have reason to know the fact giving rise to the failure of condition."); RESTATEMENT (SECOND) OF CONTRACTS § 93 ("A promise within the terms of §§ 82-85 [including a promise of waiver under section 84] is not binding unless the promisor knew or had reason to know the essential facts of the previous transaction to which the promise relates . . .").

[22] CORBIN ON CONTRACTS provides the following example: "B contracts to erect a building for O who promises to pay $100,000 therefore after completion. . . . If O agrees without consideration to waive this condition and to pay $100,000 to B without getting any building whatever, no court would enforce O's promise . . ." CORBIN ON CONTRACTS § 40.1 at 522; *see also id.* (*"A condition of a promisor's duty can be eliminated by a mere voluntary expression of willingness to waive it, if its performance does not constitute a material part of the agreed equivalent of the promise and its nonperformance does not materially affect the value the promisor received."*) (italics original); RESTATEMENT (SECOND) OF CONTRACTS § 84 and comment d ("promise to perform . . . a conditional duty . . . in spite of the non-occurrence of the condition is binding . . . unless . . . occurrence of the condition was a material part of the agreed exchange"); Allan Farnsworth, FARNSWORTH ON CONTRACTS § 8.6 at 452 (3rd Ed. 2004) ("The concept of waiver is restricted to conditions that are relatively minor.")

[23] *United Counties Trust Company v. Maclum, Inc.*, 643 F.2d 1140, 1144 (5th Cir. 1981); *Randy v. Columbia/HCA Healthcare Corp.*, 2003 U.S. Dist. LEXIS 17270 (N.D. TX. Sept. 30, 2003).

the merits of Valero's claims, Valero is entitled to pursue discovery on both its own claims and DESC's waiver defense.

For the foregoing reasons as well as those Valero sets forth in the initial section of this status report, Valero requests that the Court lift the stay of proceedings and order that discovery commence for all purposes.

Respectfully submitted,

s/ J. Keith Burt
J. Keith Burt
Mayer, Brown, Rowe & Maw, LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208 (Phone)
(202) 263-5308 (Fax)

Attorneys for Plaintiffs,
Valero Refining-Texas, L.P., Diamond Shamrock Refining and Marketing Company, Diamond Shamrock Refining Company, L.P., and Sunbelt Refining Company, L.P.

*Of Counsel:*

Monica A. Aquino
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

Martin E. Loeber
Valero Energy Corporation
One Valero Place
San Antonio, TX 78212

Dated: September 12, 2005

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Senior Trial Counsel
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-2311 (Phone)
(202) 353-7988 (Fax)

Attorneys for Defendant-Appellee,
The United States

*Of Counsel:*

BERNARD A. DUVAL
Counsel
HOWARD. M. KAUFER
DONALD S. TRACY
Assistant Counsel
Office of General Counsel
Defense Energy Support Center
Fort Belvoir, VA 22060

Dated: September 12, 2005