IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| VALERO REFINING-TEXAS, L.P.,<br><br>And<br><br>DIAMOND SHAMROCK REFINING AND MARKETING COMPANY,<br><br>And<br><br>DIAMOND SHAMROCK REFINING COMPANY, L.P.,<br><br>And<br><br>SUNBELT REFINING COMPANY, L.P.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | ) | No. 03-1916C<br>(Judge Firestone) |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S**
**PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to RCFC 56(h)(2), Plaintiffs, Valero Refining-Texas, L.P., Diamond Shamrock Refining and Marketing Company, Diamond Shamrock Refining Company, L.P., and Sunbelt Refining Company, L.P. (collectively, "Valero"), respectfully submit their response to Defendant's Proposed Findings of Uncontroverted Fact. Valero sets forth its response to each of Defendant's proposed findings of fact below.

1. Plaintiff Diamond Shamrock Refining and Marketing Co. is a Delaware corporation. Plaintiffs Diamond Shamrock Refining Co., L.P. and Sunbelt Refining Co., L.P. are Delaware limited partnerships. Plaintiff Valero Refining – Texas, L.P. is a Texas limited partnership. Compl. ¶¶ 1-4. The plaintiffs are subsidiaries of Valero Energy Corp. ("Valero Energy"). Compl. ¶ 5. Valero Energy is a Fortune 500 company based in San Antonio with approximately 20,000 employees, revenues of nearly $30 billion, and assets of $14 billion.

Valero Energy has an extensive refining system with a throughput capacity of almost 2 million barrels per day. The company's geographically diverse refining network stretches from Canada to the U.S. Gulf Coast and West Coast. In combination with its interest in Valero L.P., Valero Energy has 4,800 miles of refined product and crude oil pipelines as well as refined product terminals, which complement its refining and marketing assets in the U.S. Southwest and Mid-continent regions. A marketing leader, Valero Energy has approximately 4,100 retail sites in the United States and Canada, branded as Valero, Diamond Shamrock, Ultramar, Beacon and Total. The company markets on a wholesale basis through a bulk and rack marketing network in 40 U.S. states, Canada and Latin America. See http://www.valero.com/.[1]

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited.

2. DESC is a field activity of the Defense Logistics Agency ("DLA"), a component of the Department of Defense ("DoD"). 48 C.F.R. ("DFARS") § 202.1. Among other things, DESC (formerly called the Defense Fuel Supply Center, or "DFSC") purchases refined fuels for the military worldwide. Compl. ¶ 6.

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited.

3. DESC issues annual requests for proposals ("RFPs"), and receives dozens of offers to fill the Government's bulk fuel products. Def. App. 2 (Walker Decl.) ¶ 4. No offer is sufficient to fill the Government's needs. Id. Accordingly, DESC evaluates the proposals and awards contracts to a number of companies each year, based upon the lowest overall cost to the Government. Walker Decl. ¶ 7.

---

[1] "Def. App." refers to the appendix submitted in conjunction with DESC's first motion for summary judgment. "SA" refers to the supplemental appendix attached to DESC's motion to dismiss. "App." refers to the appendix submitted in support of Valero's opposition to DESC's pending motion.

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited.

4. Between 1985 and 1999, Valero entered into at least 36 DESC one-year, Bulk Fuels Program contracts, for the supply of JP-4, JP-5, and JP-8 jet fuel, and F-76 diesel fuel. Compl. ¶¶ 9, 35-38; Walker Decl. ¶ 3. Under the contracts, Valero delivered approximately 1.25 billion gallons of jet fuel and was paid in excess of $705 million. Walker Decl. ¶ 4.

**Valero's Response:**

Admits the allegations in the first sentence to the extent supported by the evidence cited. Denies the allegations in the second sentence pursuant to RCFC 56(f).

5. JP-4 jet fuel is naphtha-based and was used primarily by the Air Force and the Army in aircraft. Walker Decl. ¶ 3; Def. App. 46 (Schink Decl. ¶ 3). JP-8 jet fuel is kerosene-based and is similar in composition to commercial jet fuel (which is called "kerojet" or "Jet A"). It is used in both aircraft and ground vehicles. Id. JP-5 is a kerosene-based jet fuel used by the Navy. Id. F-76 is a diesel fuel used in the propulsion of Navy ships. Id.

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited.

6. Valero's contracts were competitively awarded through negotiated solicitations, pursuant to 48 C.F.R. ("FAR") part 15 ("Contracting by Negotiation"), and, beginning in 1996, FAR part 12 ("Acquisition of Commercial Items"). Walker Decl ¶¶ 4, 18. The base prices in Valero's contracts were determined to be reasonable based on adequate price competition or on established catalog or market prices of commercial items sold in substantial quantities to the general public. Walker Decl. ¶ 8.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

7. The market values of crude oil and refined petroleum products change frequently. Schink Decl. ¶ 8. Because a single barrel of crude oil may be refined into many different commercial products, however, changes in the price of crude oil are not necessarily highly

correlated with changes in the prices of refined products over the short term. Refining margins can also affect the correlation between prices of crude and refined products. Id. A barrel of crude oil constitutes the raw material for a wide variety of petroleum products sold in a multitude of more or less competitive geographic and spot markets. Id. Prices in those markets are influenced by countless factors that affect supply and demand for the individual refined products. Id. Therefore, over any given time period, changes in the market prices of some refined products, made from a portion of a barrel of crude oil, may not correlate, in either direction or magnitude, with changes in the prices of crude, or of other products. Id.

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited that the prices of petroleum products and crude oil are not directly correlated; however, denies the specific interrelationships implied.

8. Virtually all of DESC's fuel supply contracts are of the "fixed price with economic adjustment" variety, see FAR subpart 16.203, and, therefore, contain an economic price adjustment ("EPA") clause. Walker Decl. ¶ 5. DESC has used several versions of agency-drafted clause B19.33, "Economic Price Adjustment - Published Market Price." Id.

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited.

9. DESC began using EPA clauses based upon crude oil costs in 1973, in response to increases in crude oil costs experienced by suppliers as a result of the Arab oil embargo. At that time, the Government had imposed controls upon the price of crude oil. After the price restraints were lifted, DESC gave suppliers the option of selecting an EPA clause based either upon actual crude oil costs, or upon market prices for similar products. In 1981, having concluded that allowing that choice presented too many administrative problems, including difficulties in evaluating and comparing bids that used different EPA indexes, DESC began using market-based indexes exclusively. DESC chose a refined product market index because that

index was believed to closely mirror changes in refiners' costs, over time, although a given price index might not track costs over shorter periods. See Def. App. 50-51, 72-73.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

10. DESC's EPA clauses listed prices for various refined products and regions, taken from a commercially available market price publications. See, e.g. Def. App. 56-60 (parts A and D). For example, part D of EPA clause B19.33 provided a unique "reference price" (sometimes called a "base reference price") for each refined petroleum product sought in the RFP. Id. 60. DESC's principal EPA clause (B19.33) listed prices for various refined products and regions, taken from a commercially available market publication. An offeror would propose a "base price" for each product offered. That price was subject to adjustment, based upon changes in the reference price. Specifically, B.19.33 provided that "[t]he prices payable under this contract for listed items shall be the base [proposal] price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price increases or decreases per like unit of measure from the base reference price." Def. App. 60 (part D ¶(c)). The base price was primarily for evaluation purposes. Because the base price would be adjusted during performance, it was not the price the contractor received for fuel. Walker Decl. ¶ 5.

**Valero's Response:**

Denies the allegations in the first sentence that all of the listed prices were taken from commercially available market price publications. The PMM is not a commercially available market price publication. It is published by the Department of Energy. *Barrett Ref. Corp. v. United States*, 42 Fed. Cl. 128, 130, 131 (1998), *aff'd in part and rev'd in part*, 242 F.3d 1055 (Fed. Cir. 2001). Admits the allegations in the second through sixth sentences to the extent supported by the evidence cited with respect to at least some of DESC's EPA clauses; however, denies the allegations with respect to all of DESC's EPA clauses pursuant to RCFC 56(f). Denies the allegation in the seventh sentence pursuant to RCFC 56(f). Admits the allegations in the eighth sentence.

11. From at least 1985 to 1994, the EPA clauses in Valero's contracts were based upon prices published in the Petroleum Marketing Monthly ("PMM"), a Department of Energy ("DOE") publication. Compl. ¶ 13; Walker Decl. ¶ 9.

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited with respect to at least some of Valero's contracts awarded between 1984 and 1994; however, denies the allegations pursuant to RCFC 56(f) with respect to all of Valero's contracts awarded between 1984 and 1994.

12. The PMM is published by the Department of Energy, Energy Information Administration, as a compilation of transaction prices in domestic petroleum markets. Walker Decl. ¶ 9; Schink Decl. ¶ 5. All refiners, including Valero, are required by law to submit sales data to DOE monthly. Id.; 15 U.S.C. § 772. DOE compiles the data and reports monthly average sales prices for various petroleum products, by region, in the PMM. Walker Decl. ¶ 9; Schink Decl. ¶ 5. Prices were adjusted monthly under the PMM EPA clause. Walker Decl. ¶ 9.

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited; however, denies any implication that the PMM reports the fair market value of fuel. App. 607-637.

13. A significant feature of the PMM is the three-month lag time DOE requires to obtain the sales data for any particular month. Thus, for example, sales data for January are published in April, and data for February are published in May. Walker Decl. ¶ 9. This was significant in DESC's administration of the PMM-based EPA clauses, because B19.33 provided for monthly adjustments. Id. To accommodate DOE's three-month lag, DESC made monthly adjustments on an interim basis, and then reconciled them when PMM data for that month were published. Id.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

14. Beginning in 1995, Valero's DESC contracts included an EPA clause based, not upon PMM prices, but upon regional average prices reported in a commercial publication, Platts Oilgram Price Report ("Platts"). Walker Decl. ¶ 10; Schink Decl. ¶ 6. Platts is published daily. Id. Contract prices were adjusted weekly pursuant to DESC's Platts-based EPA clause, that is, contract prices remained in effect for one week. Id. Therefore, DESC was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause.

**Valero's Response:**

Admits the allegations in the first sentence to the extent supported by the evidence cited with respect to some of Valero's contracts beginning in 1995; however, denies the allegations pursuant to RCFC 56(f) with respect to all of Valero's contracts beginning in 1995. Admits the allegations in the second sentence to the extent supported by the evidence cited. Admits the allegations in the third sentence to the extent supported by the evidence cited with respect to some of Valero's contracts beginning in 1995; however, denies the allegations pursuant to RCFC 56(f) with respect to all of Valero's contracts beginning in 1995. Denies the allegations in the fourth sentence pursuant to RCFC 56(f).

15. In January, 1986, DESC's Office of Market Research and Analysis prepared a recommendation to change the procedure by which offers were submitted in DESC's solicitations for bulk fuels. SA 18. Due to the three-month lag time for prices to be published in PMM, offerors were required to submit offers tied to a reference price that had not yet been published. See PFF 13; SA 18 ¶¶ 1, 2. That is, the clause provided that the base reference price was the PMM price published for the month before the submission of best and final offers. Id. As the recommendation noted, "[s]ince the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship between the offered price and the reference." Id. at ¶ 2. The recommendation noted that "the movement of PMM compared to other references as used for interim price adjustments may have moves as much as one or two cents per gallon out of step with such interim references." Id. at ¶ 3. The recommendation noted that

offerors might increase their price to compensate for the unknown factor of what the PMM reference price would be when it was eventually published and, therefore, recommended that the best and final price be tied to an already published final and interim reference price. "For example, if the best and final date were November 15th, the final base EPA reference price would be PMM for August and the interim base reference would be the publication(s) . . . for the month of July." SA 18-19.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

16. In 1987, DESC's Office of Market Research and Analysis prepared a decision paper concerning the ". . . means of price escalation used in the domestic programs." SA 20 ¶ 1. The purpose of the decision paper was to decide whether the economic price adjustment clauses DESC was then using to adjust contract prices in long term contracts for the supply of domestic bulk fuels should be either modified to change the use of the unpublished PMM reference price, or changed to use market prices published in Platts and other "trade journals" rather than prices in PMM. SA 21 ¶ 1 (Issue). The paper considered four options for adjusting long term contract prices in domestic bulk fuel contracts. SA 20 ¶ 2. The four options were: 1) to keep the price adjustment system then in use by DESC, 2) to modify the system then in use to " . . . reduce offer price uncertainties," 3) to adjust prices twice monthly using "trade journal" prices, and 4) to adjust prices weekly using "trade journal" prices. Id., at ¶ 2; SA 25-26, Decision Options.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

17. The decision paper included a detailed discussion of the options available to DESC to adjust contract prices. SA 21-26. In a paragraph entitled "Background," the paper described the economic price adjustment system that DESC had been using since 1983. SA 21, Background. The paper set forth nine criteria by which to judge proposed escalation systems, " . . . 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity." Id. at Discussion.

The paper then compared PMM prices to "trade journal" prices for using those nine criteria. SA 21-25.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

18. The paper concluded that:

> [t]he current PMM based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality there is no clear alternate between the alternate systems.

SA 21 at Discussion.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

19. The paper included a detailed analysis of each of the nine criteria and whether each favored the PMM, the trade journal prices, or neither. The paper found that the product criterion favored neither, because "[b]oth the PMM and trade publications publish prices of similar commercial products . . . ." SA 21. Regarding geography, the paper found that both PMM and trade publications prices were published in ". . . the geographical area where the requirements are located." SA 22. Regarding commonality, the paper found that either PMM or trade publications were acceptable to both DESC and contractors, based upon the fact that DESC had used PMM prices successfully in bulk fuels for three years and had used trade publication prices successfully in contracts for ground fuels and overseas bulk programs. Id.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

20. The paper concluded that the contractor influence, contractor sales, and market risk factors favored PMM. SA 22-23. The paper noted that, although both PMM and trade publications were independent of DESC contractors, trade publications might be influenced by the moves of large "market players" "given their informal method of conducting market surveys," whereas the PMM was a survey of actual sale prices. SA 22. Regarding market risk,

the paper found that DESC ". . . contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages." SA 23. Trade publication prices were considered more ". . . variable in quality . . . ." Id. The study also found that trade publication prices were more susceptible to "price stickiness," and increased the market risk of higher prices during time periods of declining prices because sellers might be slow to lower posted prices. Id.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

21. The paper concluded that the timing and timeliness criteria favored trade publication prices. As the paper explained, because trade publication prices were published on a daily or weekly basis rather than monthly, the timing of those prices would reduce the ". . . possibility that contractors will build a contingency premium into their prices." SA 22. On the other hand, because PMM was published with a three month lag-time, it necessitated the use of interim pricing and reconciliations, i.e., more adjustments. Id.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

22. Finally, the paper set forth a summary of the "pros and cons" of the four alternatives. The paper concluded that the preferred option was to modify the existing use of PMM prices by using the latest published PMM price as the base reference price. That, the study reasoned, would eliminate "margin uncertainty" and allow bidders to base their offered prices on a known reference price. The paper pointed out that "[s]everal individuals and contractors have suggested that [DESC] modify its current system in this manner." SA 25. Starting in 1987, DESC began using this modified PMM-based adjustment, and continued to do so until 1995, when the use of trade publication prices began. See PFF 14. An example of the PMM adjustment clause in use between 1987 and 1993 is contained at Def. App. 58-60.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

23. In September, 1994, DESC requested a one-time FAR deviation to authorize the use of price adjustment based on market prices published in Platts and Oil Price Information Service ("OPIS") for that year's annual bulk fuels contract, in lieu of PMM prices. Walker Decl. ¶ 16; Def. App. 143-46. In the request for a FAR deviation, DESC set forth reasons for switching from PMM prices to Platts and OPIS prices. DESC stated that the PMM prices had been reliable, but that using Platts and OPIS would provide several advantages. In addition to eliminating the need for two price adjustments, DESC stated, "commercial publications [such as Platts are] widely accepted by industry" and would be simpler to use. Def. App. 143-46; see also, Def. App. 171. DESC further noted that its Office of Market Research and Analysis had studied the proposed Platts-based clauses and found them to provide reliable bases for price adjustments. Def. App. 146; see also,Walker Decl. ¶ 16.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

24. In May, 1995, DESC sought a Class Deviation and change to the Defense Logistics Agency Acquisition Regulation ("DLAR") that would explicitly authorize DESC to base its EPA clauses upon "industry publications" (including Platts and OPIS). Def. App. 183-87. The bases for DESC's request for such permanent authorization were the same as set forth in its request for an individual deviation the previous fall. Def. App. 185, ¶ III. B. DESC noted that "industry publications" were published more often and would eliminate the "need for double calculations or price adjustments, a significant savings to the government." Id. The deviation request noted that, due to the lag time between interim and final billing under PMM, "contractors likely build in a price cushion." The deviation also noted that the use of an "industry publication" was similar to the "way adjustments are done commercially in that commercial publications are widely accepted by industry." Id.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

25. The DESC request also noted that "industry publications" had been used for DESC programs other than bulk fuels for years. Id. As it did in its earlier request, DESC stated that its "Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable for price adjustments." Id. The Office of Market Research and Analysis study to which both deviation requests referred was the 1987 study described in PFF 16-22. SA 35, l.20 - 36, l.19.

**Valero's Response:**

Denies the allegations pursuant to RCFC 56(f).

26. Thus, beginning in 1995, the "base reference" price for Valero's Bulk Fuels Program contracts were regional average prices reported in Platts. Walker Decl. ¶ 10; Schink Decl. ¶ 6. Because Platts was published daily, DESC was able to adjust prices weekly, and, therefore, was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause. Def. App. 185.

**Valero's Response:**

Admits the allegations in the first sentence to the extent supported by the evidence cited for at least some of Valero's contracts beginning in 1995; however, denies the allegations in the first sentence with respect to all of Valero's contracts beginning in 1995 pursuant to RCFC 56(f). Denies the allegations in the second sentence pursuant to RCFC 56(f).

27. In accordance with 15 U.S.C. § 644 and FAR Part 19, many of DESC's bulk fuels program solicitations included partial small business set-asides. SA 2. Beginning in 1988, pursuant to 10 U.S.C. § 2323, DESC solicitations also included an evaluation preference of up to 10 per cent for small disadvantaged business concerns. SA 6. DESC solicitation clauses I237.05, Notice of Evaluation Preference for Small Disadvantaged Business Concerns, and I237.06, Notice of Partial Small Business Set-Aside with Preferential Consideration for Small Disadvantaged Business Concerns, set forth the operation of these programs. SA 6-7.

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited with respect to at least some of Valero's contracts; however, denies the allegations with respect to all of Valero's contracts pursuant to RCFC 56(f).

28. The clauses provided that the set-aside price would be the highest price the Government would pay for the non-set-aside portion of the fuel required for a location, and allowed negotiation with small business offerors to obtain that price. DESC did not provide small business concerns with either the identity or the prices of other offerors. SA 2. The negotiated price DESC allowed small business concerns to match was comprised of the fuel price the Government would pay plus a figure for transportation costs to the destination. Id.

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited with respect to at least some of Valero's contracts; however, denies the allegations with respect to all of Valero's contracts pursuant to RCFC 56(f).

29. Plaintiff Sunbelt was a beneficiary of the small business set-aside program for its three contracts that are the subject of these claims. SA 3. For those contracts, a portion of Sunbelt's contract consisted of small business set-aside fuel. Id.

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited with respect to at least some of Sunbelt's contracts; however, denies the allegations with respect to all of Sunbelt's contracts pursuant to RCFC 56(f).

30. During performance of the contracts at issue, Valero never raised any question regarding the legality of the EPA clauses, and it never complained that it was not being paid fairly. Walker Decl. ¶ 12. Valero also did not object to any of the hundreds of monthly and weekly price adjustments made under the contracts' PMM-based and Platts-based EPA clauses. Id. In its proposal for each contract for which DESC's contract file still exists, Valero expressly

stated that it agreed to all terms and conditions. Id. Valero submitted offers regularly from 1985 to 1999. Id.

**Valero's Response:**

Denies the allegations in the first two sentences pursuant to RCFC 56(f). Furthermore, denies the allegations because the evidence cited is not competent and amounts to little more than rank speculation. The proffered declarant, John Walker, does not even allege that he was involved in a *single one* of Valero's contracts, nor does he even allege that he ever spoke with a *single person* at Valero about its military fuel contracts. In addition, Mr. Walker was not even employed by DESC during part of the period purportedly covered by his overly broad declaration. App. 560. Admits the allegations in the third sentence to the extent supported by the evidence cited with respect to at least some of Valero's proposals; however, denies the allegations in the third sentence with respect to all of Valero's proposals pursuant to RCFC 56(f). Admits the allegations in the fourth sentence to the extent supported by the evidence cited with respect to at least some years between 1985 and 1999; however, denies the allegations in the fourth sentence with respect to all years between 1985 and 1999 pursuant to RCFC 56(f).

31. Valero submitted certified Contract Disputes Act claims regarding the subject contracts on August 9, 2002, September 9, 2002, September 13, 2002, December 4, 2002, April 2, 2003, and April 14, 2004 (after date of first Walker declaration). Compl. ¶¶ 35-38; Walker Decl. ¶ 13. Valero requested total additional compensation of approximately $128 million. Walker Decl. ¶ 13. Valero's principal contention was that the EPA clauses in its contracts were illegal, citing the MAPCO decision. Id.; e.g., Def. App. 231-88 (claim under contract SP0600-95-D-0473). Valero did not assert that the clauses were ambiguous, had failed to operate as expected, or that they had failed to protect Valero from significant fluctuations in costs or prices. Id.

**Valero's Response:**

Admits the allegations in the first and second sentences to the extent supported by the evidence cited. Denies the allegations in the third and fourth sentences on the ground that they

are legal characterizations to which no response is required, and further denies the allegations as unsupported by the evidence cited.

32. To price its claims, Valero began with the Platts U.S. Gulf Coast Pipeline Spot Price average for a similar product, and added a long-term contract premium, transportation costs, and, when appropriate, prices for additives. E.g., Def. App. 256-57 (claim pp. 24-25).

**Valero's Response:**

Denies the allegations that all of its claims were calculated in this way as unsupported by the evidence cited, and, with respect to the particular claim cited, denies on the ground that the description is materially incomplete.

33. The contracting officer denied Valero's claims in final decisions dated June 30, 2003, and June 8, 2004 (after date of first Walker declaration). Compl. ¶¶ 39-40; Walker Decl. ¶ 14; Def. App. 290-99. The contracting officer concluded, among other things, that the EPA clauses are authorized and enforceable, and that the prices calculated in Valero's claims do not reflect fair market value. Walker Decl. ¶ 14; Def. App. 291-94, 297.

**Valero's Response:**

Admits the allegations to the extent supported by the evidence cited.

Respectfully submitted,

s/J. Keith Burt

J. Keith Burt
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006
(202) 263-3208 (phone)
(202) 263-5208 (fax)

Attorneys for Plaintiffs,

Valero Refining-Texas, L.P., Diamond Shamrock Refining and Marketing Company, Diamond Shamrock Refining Company, L.P., and Sunbelt Refining Company, L.P.

*Of Counsel:*

Monica A. Aquino
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

Martin E. Loeber
Valero Energy Corporation
One Valero Place
San Antonio, TX 78212

March 13, 2006