No. 03-1916C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

VALERO REFINING-TEXAS, L.P., DIAMOND SHAMROCK REFINING AND MARKETING COMPANY, DIAMOND SHAMROCK REFINING COMPANY, L.P., SUNBELT REFINING COMPANY, L.P.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT AND SECOND SUPPLEMENTAL APPENDIX

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Department of Justice
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

DONALD S. TRACY
Trial Attorney
Defense Supply Center Richmond
Richmond, VA 23297

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

April 7, 2006

# TABLE OF CONTENTS

FACTS . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . 10

I. DESC's EPA Clauses Are Authorized by FAR 16.203-1 . . . . . . . . . . 10

A. EPA Clauses Need Not Be Based Upon Plaintiffs' Own Prices . . . . . . . 11

B. DESC's PMM-Based EPA Clause Is Legal . . . . . . . . . . 11

C. Valero's FAR 15.802(b) Allegation Does Not State A Cause of Action . 16

II. Valero's Alternative Illegality Theories In Counts II-VI Must Be Dismissed . . 18

A. Count II (Misrepresentation) . . . . . . . . . . 18

B. Count III ("Breach of Contract") and Count IV ("Implied-In-Fact Contract") . . . . . . . . . . 18

C. Count V ("Failure of Consideration and Frustration of Purpose") . . . . . 19

D. Count VI (Mistake) . . . . . . . . . . 20

III. Valero's Takings Claim Should Be Dismissed . . . . . . . . . . 21

IV. Valero's Small Business Program Complaints Must Be Dismissed . . . . . . . . . . 23

A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint . . . . . . . . . . 23

B. DESC's Small Business Program Is Not Improper . . . . . . . . . . 25

V. Waiver and Estoppel Bar Valero's Claims . . . . . . . . . . 28

A. Introduction . . . . . . . . . . 28

B. Valero Has Waived Its Claims As A Matter Of Fact . . . . . . . . . . 31

C. Valero Has Waived Its Claims As A Matter Of Law . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . 45

## SECOND SUPPLEMENTAL APPENDIX


Excerpt from deposition of John Cook, dated July 29, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Excerpt from deposition of Jacob Bournazian, dated December 3, 2003 . . . . . . . . . . . . . . . . . . . 7

Form EIA-782A ("Refiners'/Gas Plant Operators' Monthly Petroleum Product Sales Report . . 9

A Comparison of Selected EIA-782 Data with Data From Other Sources, by
Jacob Bournazian . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Comptroller General Opinion re: DFSC Small Business Set-Aside Procurements . . . . . . . . . . . 35

Declaration of Lawrence Ervin with attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Letter from ConocoPhillips to DESC, Re: Method Used to Determine Bid Award for JP-4,
dated December 18, 1986 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Excerpt from Platts web site . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Excerpt from NYMEX web site . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

FAR 15.610 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Declaration of John Walker, dated April 7, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76


## TABLE OF AUTHORITIES

### CASES


American Telephone and Telegraph Co. v. United States,
307 F.3d 1374 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

American Telephone & Telegraph Co. v. United States,
177 F.3d 1368 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 43

Armstrong v. United States, 364 U.S. 40 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Barrett Refining v. United States,
242 F.3d. 1055 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Barrett v. United States,
50 Fed. Cl. 567 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Beta Systems, Inc. v. United States,
838 F. 2d 1179 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brooklyn Sav. Bank v. O'Neill,
324 U.S. 697 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Cessna Aircraft v. Dalton,
126 F.3d 1442 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Chris Berg, Inc. v. United States,
426 F. 2d 314 (Ct. Cl. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Clark v. United States,
95 U.S. 539 (1877) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Coflexip & Servs., Inc. v. United States, 961 F. 2d 951, 952-953 (Fed. Cir. 1992) . . . . . . . . . . 24

Costanza Coal Min. Co. v. Weirton Steel Co.,
150 F.2d 929 (4th Cir. 1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Dairyland Power Cooperative v. United States,
16 F.3d 1197 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

DGS Contract Services, Inc. v. United States, 43 Fed. Cl. 227, 239 (1999) . . . . . . . . . . . . . 25, 27

E. Walters & Co., Inc. v. United States,
217 Ct. Cl. 576 F.2d 362 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Federal Crop Ins. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Federal Elec. Corp. v. United States,
486 F.2d 1377 (Ct. Cl. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

General Eng'g. & Mach. Works v. O'Keefe,
991 F. 2d 775 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Gold Line Refining v. United States, 54 Fed. Cl. 285 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Gould v. United States, 67 F.3d 925 (Fed. Cir. 930 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 23

Hartford Accident & Indem. Co. v. United States,
127 F. Supp. 565 (Ct. Cl. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Hermes v. United States,
58 Fed. Cl. 409 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Integrated Logistics Support Systems, Int'l v. United States, 42 Fed. Cl. 30 (1998) . . . . . . . . . 22

La Gloria v. United States, 56 Fed. Cl. 211 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

La Van v. United States, 382 F.3d 1340, 1352 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 21

LaBarge Prods., Inc. v. West,
46 F.3d 1547 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ling-Temco-Vought, Inc. v. United States,
201 Ct. Cl. 135, 475 F.2d 630 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Louisville and Nashville R.R. Co. v. Cent. Iron and Coal Co.,
265 U.S. 59 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 44

MAPCO Alaska Petroleum, Inc. v. United States,
27 Fed. Cl. 405 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Millmaster Intl. Inc. v. United States,
427 F. 2d 811 (Cust. Ct. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc.,
473 U.S. 614 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Nautilus Shipping Corp. v. United States,
141 Ct. Cl. 391 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Navajo v. United States, 58 Fed. Cl. 200, 213 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Northern Helex Co. v. United States,
197 Ct. Cl. 118, 125-26 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Osprey Pacific Corp. V. United States, 41 Fed. Cl. 250 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 21

PCL Construction Services, Inc. v. United States,
41 Fed. Cl. 242, 252 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Pi Electronics Corp. V. United States, 55 Fed. Cl. 279 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 22

Pittsburgh C.C. & St. L. Ry. Co. v. Fink,
250 U.S. 577 (1919) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Rough Diamond Co. v. United States,
351 F.2d 636 (Ct. Cl. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Safeco Credit v. United States,
44 Fed. Cl. 406 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Shearson/American Express, Inc. v. McMahon,
482 U.S. 220 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Short Bros., PLC v. United States,
65 Fed. Cl. 695 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Shutte v. Thompson,
82 U.S. 151 (1872) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Sola Electric Co. v. Jefferson Electric Co.,
317 U.S. 173 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Sprague Steamship Co. v. United States,
172 F. Supp 674 (Ct. Cl. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Tesoro et al. v. United States,
405 F. 3d 1339 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Tesoro v. United States, 58 Fed. Cl. 65 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Thomas v. United States,
125 Ct .Cl. 76, 80 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Union Pacific Railroad Co. v. United States,
847 F.2d 1567 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Mezzanatto,
513 U.S. 196 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Wurts, 303 U.S. 414, 415 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Urban Data Sys., Inc. v. United States,
699 F.2d 1147 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## STATUTES AND REGULATIONS

15 U.S.C. § 772 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

41 U.S.C. § 423 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

DAR § 1-1502(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

FAR § 15.402(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FAR 15.404-1(b)(2)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

FAR § 15.802(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FAR § 15.804-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

FAR § 16.203-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FAR § 16.203-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

FAR § 16.203-4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

FAR 52.219-7(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## MISCELLANEOUS

Restatement (Second) of Contracts § 178 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Nash and Cibinic, Formation of Government Contracts (3rd Ed. 1998) . . . . . . . . . . . . . . . . . . . 17

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| VALERO REFINING-TEXAS, L.P., | ) | |
| | ) | |
| And | ) | |
| | ) | |
| DIAMOND SHAMROCK REFINING AND MARKETING COMPANY, | ) | |
| | ) | |
| And | ) | No. 03-1916C |
| | ) | (Judge Firestone) |
| DIAMOND SHAMROCK REFINING COMPANY, L.P., | ) | |
| | ) | |
| And | ) | |
| | ) | |
| SUNBELT REFINING COMPANY, L.P., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE COMPLAINT

In our moving brief, we demonstrated that Plaintiffs' (collectively, "Valero") complaint attempted to clone the cause of action at issue in MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992), which held that DESC's jet-fuel contract price escalation Clause B19.33 was inconsistent with the Federal Acquisition Regulation ("FAR"). In Tesoro et al. v. United States, 405 F. 3d 1339 (Fed. Cir. 2005), reh'g en banc denied, No. 04-5064 (Fed. Cir. Aug. 22, 2005) ("Tesoro"), the court of appeals abrogated MAPCO, holding that B19.33 had been legal all along. The court explicitly rejected the contractors' contention, repeated here, that B19.33 was illegal because it was based upon "indexes rather than on Plaintiff's own established fuel prices;" and because it used the Department of Energy's Petroleum Marketing Monthly

("PMM") as a price reference. As our moving brief explains, the standard Tesoro established for economic price adjustment ("EPA") clauses also effectively disposes of Valero's miscellaneous complaints concerning the legality of its contracts' EPA clauses, because it makes clear that the various tests Valero would have these clauses pass simply do not exist. In fact, the court held, in order to pass muster under FAR 16.203-1, EPA clauses need only rely upon "industry-based prices," which "may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347.

In response, Valero amended its complaint to assert that the contracting officer had an obligation to assure Valero was paid "fair and reasonable prices, pursuant to FAR 15.802(b) (currently codified at FAR § 15.402(a))" (see Compl. ¶ 46); yet, still clung to allegations squarely rejected by Tesoro (that the escalation clause must be based upon Valero's own prices) or those that invoke requirements found nowhere in the law (that EPA clauses must be "designed or intended" to set prices and "reflect at least the fair market value of military fuel"). As our motion explains, these allegations do not invoke a proper legal test for EPA clauses and, therefore, fail to state a claim upon which relief can be granted.

Valero also clung to its common-law allegations which, although allegedly grounded in the parties' understandings and commitments, lack a factual basis -- one that might establish the essential unrequited promise or understanding that typically undergirds such allegations. Their deficiency is unsurprising, because, as our motion explains, they are but thinly-disguised restatements of the Count I complaints, which, in turn depend upon MAPCO for their vitality. Accordingly, with regard to these allegations too, there simply is no relevant fact that Valero possessed or envisioned that can transform these counts into authentic common law claims.

We also explained that, regardless of the above, Valero abandoned any rights the FAR might have conferred upon it, and Valero forfeited any right it might have had to test those rights in litigation when it waited as many years as it did to file the necessary claims. In doing so, we relied upon this Court's decision in Hermes v. United States, 58 Fed. Cl. 409 (2003) ("Hermes II"), which held that the contractor that brought a suit identical to this one no longer could pursue its illegality-based claims. As we demonstrated, Valero's rights with respect to its derivative claims are indistinguishable and also should be dismissed.

Valero responds with a broadside attack upon the PMM itself, based upon incomplete quotations, innuendo, and a report from its consultants quibbling with the use of the escalation clause that the parties agreed to use. Absent from the report's theoretical discussion is a report of actual harm to Valero and an acknowledgment that the court of appeals has determined that the clause is legal, even if not to the liking of Valero's pricing advisors. Valero's efforts to resuscitate the complaint via common law complaints of mistake, misrepresentation, breach, frustration of purpose -- premised on the very same lack of "fair market value" argument -- and absent traditional allegations of agreement-based, unrequited expectations – fare no better. That is so, because a cause of action that has, at its root, the existence of a right that does not exist (the right to an EPA clause based upon a contractor's own prices, or one based upon "fair market value") does not become stronger by adding further elements of proof. The other basis of Valero's response is that it "requires discovery." As we explain in our separate response to Valero's RCFC 56(f) motion, Valero's motion demonstrates that it "requires discovery" only to discover its own case and other matters that are untethered to legal causes of action. Accordingly, Valero is not *entitled* to discovery and cannot plead lack of discovery to prevent the termination of this litigation.

## FACTS

Valero continues to rely upon the same partial quotations and quaint charges of Government scheming pedaled in its opposition to our motion for partial summary judgment. To this, Valero adds a consultants' opinion concerning the performance of the PMM, also built-upon unfounded premises, and a conclusory statement from one of Valero's officials declaring that Valero intended to receive legal prices and fair market value.[1] See Compl. ¶¶ 19-24; Pl. Br. 5-8. In addition to being untrue, these allegations concern the relative merits of various price references -- a discussion best left to economists and fuel-industry analysts -- not the parties to a contract years after their contracts have been fully performed. In general, Valero's logic-bending story is that: DESC knew that its use of the PMM was corrupt; DESC had concluded that the price of fuel would, in the future, move in one direction; the PMM and all of the references DESC used would report movement in the opposite direction; that movement always would favor DESC; and, somehow, the fuel industry never would detect this or, upon learning it, would bid eagerly nonetheless.

Valero's story begins with the Energy Information Administration ("EIA"), the author of the PMM. Among Valero's favorite allegations and a pillar of its complaint is that the EIA has

---

[1] Notably, Valero declines to address contracts containing other than PMM price references. Pl. Br. 3, n. 5. It also declines to address our PFFs concerning those references, citing RCFC 56(f). Valero cannot seriously assert that the other references are not market-based price sources or that it requires discovery to learn that fact. In fact, while disagreeing that a DESC study supported the use of PMM, Valero's brief acknowledges that the study "supported using the commercial price references Platts and OPIS to make price adjustments." Pl. Br. 6. Indeed, Valero's consultants use Platts to assess the market. Pl. App. 623 ¶ 49. And, Platts' description of its publication (not to mention Valero's failure ever to protest its use) also suggests that there can be no disagreement over this matter. See SA 69. Accordingly, there is no basis for further proceedings concerning paragraph 29 of the complaint, which alleges that "[o]n information and belief, DESC also knew that some of the other indexes it used to set or adjust prices were not appropriate for these purposes."

acknowledged that the PMM was not "intended to be an index that is used for setting prices." Pl. PFF 16. The implication is that the PMM is unsuitable or illegal for use as a price reference. What Valero avoids quoting is the testimony of the EIA's Dr. Cook on that point, which was:

> We're not opposed to [the PMM] being used for that purpose. We don't, per se, collect the data and justify its collection with OMB for that specific use. We justify its collection on the basis of its general value in measuring actual average prices, wholesale and retail, for everything from crude oil from the wellhead to the pump for state energy offices or various federal agencies, and most especially for Congressional committees for analysis purposes, forecasting, market tracking, all those uses. It's, it's, it happens to be useful, according to oil companies and DFSC for indexing, as well, but we didn't specifically design it for that.

Second Supplemental Appendix ("SA2") (attached to this brief) at 5-6 (Tr. 632, l. 14).

Valero also suggests that EIA and DESC cooperated surreptitiously to tilt the PMM in DESC's favor, and that DESC breached an obligation to disclose that it worked with EIA "to see that our needs are satisfied." Pl. Br. at 40, n.45; see also Pl. Br. at 5, n.8. However, the document upon which the assertion relies, Pl. App. 100, is taken out of context. As Valero's next document explains, DESC asked that EIA employ a "phased-in" approach to a new PMM format EIA was developing. DESC suggested that this could take the form of a dual reporting scheme in which EIA proceeded with its new method, but also included the old method until existing DESC contracts relying on the old method expired. Pl. App. 101-02. This hardly affected the contracts at issue or implicated a legal duty owed to Government fuel suppliers.

Lacking EIA's condemnation, Valero relies upon a litigation consultants' generalized assessment of the PMM, to argue that the PMM is illegal because it does not "reflect fair market value" (Pl. Br. 9), suffers from an "index number problem" (Pl. Br. 13), and does not measure "military jet fuel." Id. at 14. As we explain in our response to Valero's proposed findings, the

difficulty with the fair market value allegation (in addition to its lack of relevance to the parties' actual price agreement) is the fact that it depends upon the assumption that the "market" is represented only by data published in Platts. Platts publishes spot market price assessments. Defendant's Appendix, attached to our 2003 motion for partial summary judgment ("Def. App.") 251-52. The PMM reports all sales. SA 12 (item III) and 19 (item 23). A "spot" market is "a market where goods are traded for immediate delivery." SA2 at 71 (Platts Glossary); see also SA2 at 73 (NYMEX Glossary (spot is a "[t]erm which describes a one-time open market cash transaction, where a commodity is purchased 'on the spot' at current market rates. Spot transactions are in contrast to term sales, which specify a steady supply of product over a period of time")).

Valero's "index number problem" allegation also is untethered from the parties' contracts, and is not supported by the evidence. The index number problem refers to an "index" that contains two or more products whose relative prices or quantities are changing. The basis for this argument is Valero's consultants' assertion that the PMM "uses current-period volume weights; that is, the reported sales prices are weighted by the actual sales volumes of different products and in different locations in each period." Pl. App. 616. The consultants also assert that "the price data reported in the PMM often represent an aggregate of multiple different fuels sold across many locations." Id. (Apparently, the consultants mean the product mix changes). However, as EIA's Mr. Bournazian explained to Valero's counsel, during a deposition in La Gloria v. United States, No. 02-465 (Fed. Cl.), the price data at issue is not an index, which is "a ratio of two numbers." SA 8.

Moreover, the PMM does not mix fuel products. As the contracting officer has explained, "PMM price averages are based on petroleum product sales information reported to

DOE and grouped by product, type of sale, states, and by geographic regions." Def. App. 5 (Walker Decl. ¶ 9). The EIA Form 782A, which collects that information, confirms as much. SA 9-20. It provides strict requirements that require the segregation of product sales reports. Thus, kerosene-based jet fuel is reported on one line of the form, while different types of gasoline and diesel fuels are reported on others.[2] Even the article relied upon by Valero's consultants does not indicate fuel products were mixed. In fact, it studies the different types of fuel separately, including "U.S. Kerosene-Type Jet Fuel." SA2 22-7.

Valero's quarrel with the type of fuel references goes well beyond the test of a "market based" EPA clause announced in Tesoro, and also is unwarranted. The contracts at issue were for the sale of a variety of fuels, including JP-4, JP-5, JP-8 jet fuel, and F-76 diesel fuel.[3] Def. App. 2 ¶ 3. The PMM explicitly requires the report of JP-5 and JP-8 sales on line 15 of the PMM report form (SA 10 (Line 15) and 19 (Item 13)), and that is the item to which the JP-5 and JP-8 contracts referred. See, e.g., Pl. App. 785 ("Reference Price Tabulation"). The PMM did not report the sale of JP-4, which is a blend of naphtha and kerosene. SA2 at 41. Accordingly, Valero's contracts designated the reference price as a combination of PMM-reported prices relating to naphtha and kerosene. Id. Because kerosene-based jet fuel is, by far, the largest volume kerosene product, DESC used the PMM report of kerosene-type jet fuel to reflect changes in value of the kerosene component of JP-4. Id. Naphtha sales are not reported in

---

[2] Thus, this reporting is different than that which might be encountered with a true "index," such as the Consumer Price Index, which is based upon a "market basket" of different items. See, generally, http://www.bls.gov/lpc/lprdho95.pdf (Bureau of Labor Statistics paper on the index number problem); http://www.imf.org/external/np/sta/tegppi/ch15.pdf (International Monetary Fund paper addressing the question of "How exactly should the microeconomic information involving possibly millions of prices and quantities be aggregated into a smaller number of price and quantity variables? This is the basic index number problem").

[3] Valero does not challenge the PMM product used as a reference for F-76 sales.

PMM. However, naphtha is an intermediate product in the manufacture of gasoline and, therefore, changes in its value are related to changes in the price of gasoline. Id. Accordingly, Valero's contracts used the report of wholesale gasoline to reflect changes in the value of the naphtha component of JP-4. Id. Valero's consultants argue the use of this kerosene/gasoline blend was "simplistic" and "inappropriate." Pl. App 620. However, in 1986, before the onset of this litigation, at least one of the plaintiffs in this litigation admitted otherwise. Writing to DESC about its JP-4 contracts, that "Conoco has no complaint with the way the PMM is calculated and used but with the timing of its availability." SA2 68.

Lacking any proof of the PMM's inherent illegality, Valero asserts it was misled, because DESC knew that the PMM moved as much as two cents per gallon out of step with other market references, would not protect suppliers, and failed to disclose that. Compl. ¶¶ 20-23; Pl. Br. 5-7. For example, the complaint alleges that a 1987 DESC study concluded that "PMM did not protect against market fluctuations and did not ensure that the prices DESC paid for military fuel under the long-term contracts reflected at least fair market value." Compl. ¶ 22. See also Pl. Br. 6 (the "study supported using the commercial price references Platts and OPIS to make price adjustments -- not the PMM"). In fact, although the study found features to recommend both the PMM and trade publications (Def. PFF 16-22), it concluded that DESC should continue using PMM prices, but change the reference month, in order to use a reference price that had been published and was available at the time bidders were submitting their offers. PFF 22.[4]

[4] Valero's allegation that "DESC did not disclose this study to its suppliers" is undercut by the very evidence it offers on that point. See Pl. App. 596 (handwritten note on cover memorandum to "proposed final draft" shows that some suppliers were canvassed on the proposal to continue using PMM prices with an earlier base reference price. ("Option II industry survey-Barrett, Pride, Chevron, Dia. Sh.-great idea! Calcasieu-indifferent Sun, West. Pet, Gladieux, Peerless, AIRI-won't hurt-might help")). "Dia. Sh." apparently refers to Diamond Shamrock, a plaintiff in this case.'

Avoiding the 1987 study's actual conclusions, Valero relies upon out of context quotations taken from the study. For example, Valero cites a supplier's statement that "we never know if we have made or lost money when you (D[E]SC) lift a cargo." Pl. Br. 7. Valero fails to explain that the comment concerned the interim-final price adjustment issue, not the use of PMM *per se*. See Def. Supplemental Appendix ("SA"), attached to our moving brief, at 21, Background. But, the disparity between interim payments and final payments was well known by both parties, i.e., that various interim references (those used to provide a price adjustment while final PMM numbers for the month were being compiled by EIA) yielded different figures than the PMM and could over or under-predict the final price adjustment due. For that very reason, the contracts with PMM EPA clauses provided for final price adjustments, to be made when the applicable PMM prices were published. Such a two-step payment procedure would have been unnecessary if the references were identical. Thus, Valero knew from its many interim and final payments that reference prices differed.[5] See PFF 13.[6]

Valero also cites a DESC statement that the use of trade journals "would cost DESC money" and that there would be "market risk" if adjustments were based on trade journal prices for "jet kerosene." Pl. Br. 6-7. But, the quotations were based upon potential flaws with the trade journals, not advantageous flaws in the PMM. The "market risk" stemmed from DESC's

[5] Valero attempts to infuse some significance to the difference between the PMM and other price references by asserting that DESC required its suppliers to submit bids to the one ten-thousandth of a cent. DESC did not "require" that offerors ". . . submit bids to sell military fuel to the one-ten-thousandth of a cent ($.000001)." Compl. ¶ 20; Pl. Br. 6. DESC only evaluated offers to that decimal place. Bidders were free to, and often did, submit bids to fewer decimal places. See, e.g., Pl. App. 746 (two places), 829 (four places), 952 (two and three places).

[6] Valero's "Response to Defendant's Proposed Findings of Uncontroverted Fact" denies PFF 13, "pursuant to Rule 56(f)." Valero cannot seriously claim a need for discovery regarding whether its contracts contained interim and final price adjustments. In fact, its own Appendix contains contracts specifying them, precisely as set forth in PFF 13. See, e.g., Pl. App. 853-55.

analysis that trade journals reported unrealistically high prices ("price stickiness") during periods of declining prices. PFF 20; SA 23. Another "market risk" noted was the fact that only a single trade journal reported "jet kerosene" prices, and that it might discontinue publication. SA 23.

To round out its conspiracy tale, Valero alleges that "seven years later, in 1994, senior officials at DLA learned of DESC's 1987 study, and, upon review of the study, directed DESC to stop using PMM to set military fuel prices." Compl. ¶ 24. However, as we explained in our response to Valero's PFF 10, it was DESC, not DLA, which, in 1994, first sought a FAR deviation to begin using trade publication prices for price adjustments. PFF 23, 24. DESC did so, not because it had concluded that refiners were not receiving "fair market value," but for some of the same reasons that had been set out in the 1987 study, including the elimination of the need for interim price adjustments, the wide acceptance of trade publication prices by industry, and the relative simplicity of the use of trade publication prices. PFF 24. The apparent basis for Valero's theory is the deposition testimony of Lawrence Ervin that the change from PMM prices to trade journal prices "was made in response to some pressure from headquarters to do things differently." SA 36. However, as he explained, the "pressure" was to "produce substantial savings to the taxpayer." Id; see also Def. Response to PFF 11. Valero cannot explain how DLA would expect to produce "substantial savings to the taxpayer" while at the same time eliminating the use of PMM, which, according to Valero, underpaid suppliers.

## ARGUMENT

### I. DESC's EPA Clauses Are Authorized by FAR 16.203-1

In Count I, Valero asserts: (1) that the clauses were illegal because there were not based upon "Plaintiffs' own established fuel prices" (Compl. ¶ 44); (2) that the clauses were illegal because they were "not market-based, were not designed or intended to be used to set or adjust

prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 45); and (3) that the contracts were awarded in violation of FAR § 15.802(b) (now codified at FAR 15.402(a)) (contracting officer's duty to review price reasonableness) (Compl. ¶ 46).

A. EPA Clauses Need Not Be Based Upon Valero's Own Prices

As explained in our moving brief, Tesoro explicitly rejected Valero's first argument, holding that the theory that "FAR 16.203-3 requires that adjustments be based only on changes in the prices charged by individual contractors eviscerates the regulatory meaning of the term 'established prices' and the policy reasons for using it." Id. Summarizing, the court explained that: "According to the interplay of all four sections of FAR § 16.203, a 'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347 (emphasis added).

Valero's only rebuttal to this point is its assertion that Tesoro was wrongfully decided, and that Barrett Refining v. United States, 242 F.3d. 1055, 1060 (2001), provides the proper rule of decision. Pl. Br. 21, n. 26. However, that argument was examined in Tesoro and rejected. Tesoro, 405 F. 3d 1345 (noting that the Barrett court was not presented with the issue of legality). Accordingly, that argument appears to have reached an end – at least in this Court.

B. DESC's PMM-Based EPA Clause Is Legal

In Tesoro, the court did not stop with the question of whether, in general, an EPA clause not based upon the contractor's own price would be illegal, because the argument presented to it (especially given reliance upon MAPCO) concerned the nature of the PMM. Accordingly, the court of appeals explicitly considered whether DESC's PMM-based EPA clause was an "established prices" clause and held that it was. Our moving brief quoted at length from Tesoro. It demonstrated that the court stated that it was considering the legality of the PMM (e.g., the

certified question for interlocutory review was "Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to PMM?" (id. at 1342 (emphasis added)), and considered various of the factors cited by MAPCO, as the basis for *its* holding the PMM was not an "established prices" clause (e.g., that the PMM was an "amalgamation of the previous month's sales data" and, as such, did not comport with the dictionary definition of "established").

Summarizing the sweep of its review, the court of appeals concluded:

> Because we conclude that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR, we do not reach the other issues raised in the certified questions . . . . Our holding that the use of the PMM-based EPA clause was authorized under the statute moots the issue [of waiver]. . . . .
>
> For the foregoing reasons, we hold that the Court of Federal Claims erred in holding that DESC's use of a PMM-based EPA clause was not authorized under the FAR.

Id. at 1348-9 (emphasis added).[7]

In the trial-level decisions that led to Tesoro, the plaintiffs disagreed concerning whether the PMM could be considered an "established prices" clause, arguing that the PMM was only an amalgamation of prices, was not based upon actual sales of jet fuel, and so forth. See, e.g., MAPCO, 27 Fed. Cl. 405. Neither the various trial courts nor the court of appeals found a genuine issue that might have precluded a judgment in our favor. Nor did these courts posit that there was a further test of what it means to be "market-based." The plaintiffs in Tesoro certainly

[7] Valero reads too much into the comment in our appellate brief that we did not consider the appellate court's review to be a "beauty contest" of individual price references. Indeed, we did not and do not here, because it is not for the courts to determine whether one EPA clause is better than another from a business, pricing or economic standpoint. That choice is the agency's and can be voided only upon a finding that it is illegal. In any event, our argument does not dictate how the court itself actually decided the appeal.

never suggested that the PMM or any of the various references were not market-based. Nor does the purpose of the EPA clauses themselves.

As we have explained in earlier briefings, the FAR's bias is for competition. Nothing provides a less-assailable ground for competition than firm-fixed prices. To permit an exception – one that allows the winning bidder of a single, price-based competition to escape that price for subsequent sales, yet be the sole supplier for those subsequent lots – potentially eviscerates a competition-based system. Accordingly, to assure that prices remain tethered to the competition, the FAR requires that escalators be independent of the contractor's prices and be permitted only when the nature of the sale requires it (such as the sale of as volatile a commodity as fuel). As the court explained it, "the policy behind requiring use of 'established prices' is to avoid contracts subject to the operational whims of individual contractors." Tesoro, 405 F.3d at 1347.

Even if the court intended to effect a *sub silentio* remand on the question of whether a PMM-based clause was a market-based clause, the FAR itself requires nothing more than the clause be "market-based" – not that it move with Platts or that it meet any particular standard of precision. Indeed, Valero offers no new legal standard. Rather, it simply seeks to remove the unambiguous standard the parties agreed upon years ago.[8] And, rooted as it is in the post hoc arguments of economists and industry-watchers, Valero's approach relegates the parties to observers, not makers, of their agreements.

---

[8] Valero's reference to Beta Systems, Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988), does not supply that standard either. At issue there was a Defense Department FAR supplement not applicable here, which supplied specific criteria for *cost index*-type clauses. Indeed, the existence of such a detailed provision suggests that, if the agencies had wished to further regulate EPA clauses to the degree Valero suggests, they would have done so. Where the regulating authorities having stayed their hand, the courts should not regulate.

Nonetheless, the complaint asserts that the PMM clauses could not be legal, because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 45). As we noted in our moving brief, these standards cannot be found in the regulation or in Tesoro. Rather than defend the sufficiency of these proffered legal tests, Valero relies upon the opinion offered by its consultants concerning an appropriate price reference. The difficulty with relying upon opinions, even if taken as fact, is that, absent a legally-cognizable cause of action, the facts are immaterial to a court of law.

In sum, the materiality of the opinions rests upon the degree to which they can plumb the simple regulatory requirement that an EPA clause be "market-based." But, there is little room for doing so. Indeed, in Tesoro, the court was able to decide the legality of the DESC clause with little more than the legal description of the PMM. Following the appellate court's lead, our moving brief established that the PMM was "market-based" upon the same basis. Thus, we noted that a statute requires refiners and sellers of petroleum products to report actual sales data to DOE. 15 U.S.C. § 772. It is this data upon which the PMM is based. See Def. PFF 12. Because the prices are established in sales between fuel sellers and buyers, it surely can be said that the EPA clause was based upon market prices, and satisfies the FAR 15.804-3 requirement that market prices be established in the ordinary course of business between buyers and sellers free to bargain.

While apparently acknowledging that DESC was within its rights to use a "proxy" for JP-4, Valero's consultants assume that the reference must reflect the same "composition" as JP-4. But, even assuming the consultants' chemistry is correct, that level of precision is not required by Tesoro or the FAR. FAR 16.203-1(a)(1) requires only that adjustments based upon

established prices be "based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items." (Emphasis added). Thus, the prices of the precise end items need not be used. To the same effect, FAR 16.203-4(b) ("Adjustment based on established prices -- semistandard supplies") acknowledges that EPA clauses are appropriate for "semistandard" supplies, defined as those for which "the prices can be reasonably related to the prices of *nearly equivalent standard supplies* that have an established catalog or market price." (Emphasis added). Here, for example, because sales of JP-4 jet fuel were not reported by the PMM, the contract provided that the price of compositionally-related fuels would provide the benchmark for price adjustments. As we have shown, JP-4 is a kerosene and naphtha-based fuel. Def. App. 46; SA2 at 41. Naphtha can be blended into JP-4 and is an intermediate product in the manufacture of gasoline. Id. Accordingly, naphtha and kerosene became the agreed-upon supplies whose price changes would provide the reference for JP-4. Valero's insistence that the parties may not agree to adjust the price of a particular blend of fuel based upon a reference that does not specifically report the sale of that blend simply is not correct. [9]

[9] Valero's consultants' report also is flawed because its key conclusion (that PMM does not track "fair market value") is based solely upon the fact that PMM and Platts do not necessarily track each other. Yet, there is no requirement that they do. The report also is marred by statements for which there is no evidence, including the premise of its "index number" theory (as noted in our fact discussion) that the PMM mixes types of fuel. The report's assertion that the reference formula for JP-4 includes "sales of supplies destined to serve individual consumers at retail outlets" (Pl. App. 625) is similarly misleading. In fact, the formula included 70 percent gasoline of "Unleaded Regular Gasoline All Refiners Sales *for Resale*" (Pl. App. 944 (emphasis added)), which is tracked separately in the PMM from retail sales. SA 10, 19, 25-6. The report's assertion that the PMM also does not report "military" jet fuel is of the same caliber. In fact, EIA captures data for "kerosene-type jet fuel," including military jet fuels JP-5 and JP-8. SA 19 (item 13).

C. Valero's FAR 15.802(b) Allegation Does Not State A Cause of Action

In our moving brief, we demonstrated that Valero's effort to root its core complaint in a violation of FAR § 15.802(b) (currently codified at FAR 15.402(a)), does not state a claim upon which relief can be granted, because it does not create an enforceable right for contractors.[10] See Short Bros., PLC v. United States, 65 Fed. Cl. 695, 764-65 (2005) ("The FAR provisions cited by Valero purport to do no more than to provide internal government direction. For example, FAR § 15.802 (1993), entitled "Policy," only requires that the contracting officer "[p]urchase supplies and services from responsible sources at fair and reasonable prices [.]" FAR § 15.802(b) . . . It does not afford a judicial remedy").[11] We further explained that that provision was found in that part of the regulation that was concerned with obtaining adequate price competition, so that the Government was assured of paying a reasonable price.

To address our analysis, Valero relies upon the regulation, the dictionary (definition of "fair"), and guidance to contracting officers and auditors found in the Armed Services Pricing Manual ("ASPM"), which suggests that a price should be fair to both sides. However, even if Valero were entitled to bring a FAR 15.402-based claim to this Court, the complaint still fails to state a claim, because FAR 15.402 concerns *bid and award* prices – not *adjusted* prices, which are calculated during contract performance, based upon the movement of the EPA clause. Accordingly, the ASPM refers to "price" in the singular and to "current market conditions," not

[10] FAR 15.402(a) provides that the contracting officer "must- (a) Purchase supplies and services from responsible sources at fair and reasonable prices."

[11] Valero's effort to distinguish Short Bros. is limited to noting that it was not limited to the proposition for which we cite it, and that plaintiff sought a different contract type. Nonetheless, the holding we cited is correct, and the plaintiff in Short Brothers also sought money, as Valero does here. Valero seeks to distinguish All Phase Environmental, on the ground that the GAO did not, among other things, discuss the purpose of FAR 15.402. To the contrary, the GAO noted that the agency's concern was in not paying more than warranted.

subsequent adjusted prices. As we have explained, the contractors set their offer prices and no contractor has suggested that its offer prices were unreasonable.

In any event, the ASPM guidance, the dictionary's definition of fairness, and Valero's other secondary references amount to nothing more than good advice for contracting officers interested in working with contented, motivated contractors, who are not looking to file claims.[12] However, they do not establish the existence of an enforceable interest.

Moreover, to suggest that the FAR, which was issued against a backdrop of long-established principles of commercial law (including the principle of unilateral mistake, which the FAR addresses), intended to add a cause of action not rooted in mistake is as preposterous as it is illogical.[13] Indeed, if, as Valero argues, the contracting officer's obligation to assess price reasonableness were actionable, contract pricing never would be binding, because contractors who failed to realize the *post hoc* demands of their owners or investors could occasion this Court's intervention with no more substantial an allegation than "our price was unfair!" Valero

[12] Indeed, the declarations in the record submitted by the contracting officer, John Walker (Def. App. 4 ¶ 8) and the DESC Price Analysis and Pre-negotiation Briefing Memoranda (Pl. App. 144-70, 206-78) explain how prices were determined fair and reasonable. The undisputed facts show that prices were determined fair and reasonable based upon competition and, in many cases, comparison with market prices. See FAR 15.404-1(b)(2)(i) ("normally, adequate price competition establishes price reasonableness").

[13] See Nash & Cibinic, Formation of Government Contracts (3rd Ed. 1998) at 1279 ("The primary focus of these requirements is to ensure that the Government does not pay unreasonably high prices," although they caution that "prices that are unreasonably low must also be dealt with before an award is made, because they could be evidence of mistake, non-responsibility, lack of understanding of the work, or a buy-in"). Valero's own argument makes this connection, asserting that it is grounded in a misrepresentation. Pl. Br. 33.

suggests that is not true, because courts routinely adjust prices. But, they do so upon discernible standards – not generalized claims of "unfairness," unrooted in recognized causes of action.[14]

II. Valero's Alternative Illegality Theories In Counts II-VI Must Be Dismissed

A. Count II (Misrepresentation)

In our moving brief, we established that the misrepresentation count (DESC "misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value" (Compl. ¶ 61)) should be dismissed, because there is no such applicable rule for EPA clauses. Valero's brief does not suggest one or that the Government actually misrepresented anything. Instead, Valero asserts that, because the complaint *alleged* a "misrepresentation," for the purposes of our motion, it is an established fact. Pl. Br. 34. However, misrepresentation is an allegation of law, which we need not accept. In fact, the entire point of our motion is to challenge it. Accordingly, absent any material fact pertaining to an actual misrepresentation, that count now must be dismissed.

B. Count III ("Breach of Contract") and Count IV ("Implied-In-Fact Contract")

In our moving brief, we established that Valero's breach of contract count and implied-in-fact contract counts should be dismissed, because there is no ground for striking the parties' own unambiguous agreement. We also established that an "implied-in-fact contract cannot exist

[14] Valero acknowledges that its claim cannot stand on FAR 15.402 alone, when it argues that "the determination of price reasonableness was, in essence a sham: that DESC knew that the PMM did not reflect the marketplace, [and] misrepresented what it knew for its own benefit." Pl. Br. 32 - 33 (emphasis added). In other words, as Valero's misrepresentation count goes, so goes its FAR 15.402 count. As we have explained, Valero has yet to put a fact in evidence that amounts to a misrepresentation or establishes its fanciful conspiracy theory.

if an express contract already covers the same subject matter." Trauma Service Group v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997).

Other than asserting that the contract "expressly" requires the payment of "fair market value," Valero cites no language to contradict the unambiguous language of the contract's pricing clause. Instead, Valero attempts to oust that clause obliquely, reasoning that the Spearin doctrine (Government warrants that design specifications will yield satisfactory result) and principles of contract reformation somehow trump a contract's unambiguous language.[15] But, the plain language of the contract's pricing clause does not permit such machinations. We do not necessarily disagree that if, as a matter of law, the pricing clause were stricken, that reformation could be available. Nor do we necessarily disagree that the remedy would include reviewing the parties' dealings to search for an implied arrangement; but, until this contract is voided through some other cause of action, these counts unnecessarily bloat the complaint.

C. Count V ("Failure of Consideration and Frustration of Purpose")

Count V presents a further unnecessary multiplication of the charges. Valero seeks to avoid the dismissal of Count V, by asserting that the matter is not "ripe for decision," because "DESC offers no evidence" concerning the degree of frustration. Pl. Br. 44. However, it is Valero that bears the burden of proof in advancing evidence of its purported frustration.

[15] Valero alludes to the "implied" promise to pay fair market value found in Barrett, 242 F.3d 1060. Pl. Br. 40. However, in that case, the contract was assumed to be invalid, and the court was looking for evidence of an implied in fact contract. Here, should we reach such a remedy phase, we would expect the parties to adduce evidence concerning the fact of any such implied agreement. Absent agreement upon what "fair market value" means, it is unlikely the parties are in any position to agree upon what, specifically, that might be. Notably, the denouement of Barrett was the trial court's finding that, based upon the presumed implied-in-fact agreement, the Government overpaid for three of the four contracts at issue. Barrett v. United States, 50 Fed. Cl. 567, 569-70 (2001). We understand that Valero would dispute the existence of such an implied-in-fact agreement.

Moreover, Valero's reply acknowledges that the count is grounded "on the voiding of DESC's pricing clause on the grounds of illegality." Pl. Br. 44. Accordingly, the dismissal of Valero's remaining illegality counts would result in the dismissal of this count (conversely, were it not to be dismissed, the frustration count would be superfluous) and, therefore, serves no purpose.

D. Count VI (Mistake)

In our moving brief, we demonstrated that Count VI must be dismissed for the same reason as the other alternative causes of action, and that Valero failed to meet the basic elements of proof of a mistake claim, including that, at the time of their agreement, the parties shared a mistaken belief "regarding a fact" concerning a "basic assumption underlying the contract." See Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994).

The reply asserts that the complaint's focus in this Count is the purpose of the PMM and what it is intended to measure. Pl. Br. 44-45. But, Valero's reply fails to identify any belief that it held concerning the PMM – let alone one held by DESC. As we have explained, the PMM reports on actual sales data required to be reported by statute. Valero itself was required to supply the information that was the basic ingredient of the PMM. Valero has failed to show why the purpose of the PMM or why EIA collects PMM data is material to an unambiguous contract provision that was never alleged to operate or be administered or interpreted improperly.[16] In sum, Valero's mistake pleading lacks a factual premise.

III. Valero's Takings Claim Should Be Dismissed

Valero's extended response to our demonstration that it fails to state a Fifth Amendment takings claim, Pl. Br. 46-52, confirms our central point: that Valero cannot cite a single judicial

[16] Valero's reliance upon Beta Systems does not supply its missing factual ingredient. Not only are the facts of that case not suggested here by any evidence, that case involved a DFAR supplement and specific EPA clause criteria not applicable here.

decision holding that a compensable "taking" can occur when the Government acquires property from a willing seller, pursuant to a contract that is later (for purposes of argument) held to be "illegal" or void. This is hardly surprising, as such a rule would convert every "illegal contract" claim involving real or personal property into a takings claim. "Valero alleges that the contracts were unlawful, and thus DESC physically possessed fuel to which it had no right." Id. at 50. This conclusion concerning the Government's "rights," however, does not follow from the premise of illegality. Indeed, under Valero's logic, Valero could be liable to a suit by the Government for funds paid to Valero (e.g., United States v. Wurts, 303 U.S. 414, 415 (1937)), because it would likewise be true that "Valero possessed Government money [paid under the contract] to which it had no right."

In truth, of course, both parties rightfully took ownership of the consideration freely exchanged under the fuel supply contracts; both parties received exactly that for which they contracted; and these voluntary transactions had none of the aspects of a physical or regulatory taking. In fact, a contract constitutes a right to payment of damages in the event of a failure of performance. As long as the right to such damages remains intact, as it does here, no taking has occurred. See, e.g., La Van v. United States, 382 F.3d 1340, 1352 (Fed. Cir. 2004).

Valero's argument that its constitutional claim is "substantially identical" to that in Osprey Pacific Corp. v. United States, 41 Fed. Cl. 250 (1998), also cannot bear scrutiny. Pl. Br. 48. Among other important distinctions, plaintiff in Osprey was a third party to the contract under which the Government asserted ownership of the boat, and plaintiff did not willingly deliver its property to the Government for remuneration, as did Valero. Nor is it true that "courts have consistently permitted [a] contractor to pursue takings claims in addition to breach of contract claims" when the contractor is dissatisfied with the price it received. Id. at 51.

In the first case cited by Valero to support the latter assertion, Pi Electronics Corp. v United States, 55 Fed. Cl. 279 (2003), the property right allegedly "taken," through disclosure, was a trade secret, which plaintiff did not agree to convey to the Government. Id. at 281-83. Valero, by contrast, freely passed title to its fuel for consumption by the military. In Armstrong v. United States, 364 U.S. 40 (1960), also cited by Valero, the plaintiffs were not Government "contractors," but subcontractors who asserted liens in the subject of the contract. Those plaintiffs were not attempting to convert contract claims into takings claims. In Scan-Tech Security v. United States, 46 Fed. Cl. 326 (2000), the Court held sensibly that "[i]f the express writings of the parties encompass[ed] the [Government's] right to possession" – as DESC's fuel contracts undeniably did – plaintiffs' "takings claim should be dismissed" and replaced with contract claims. Id. at 332. Similarly, in Integrated Logistics Support Systems, Int'l v. United States, 42 Fed. Cl. 30 (1998), the Court could not "conclude that the contract conferred expressly upon defendant rights of possession, use, ownership, and alienation in the materials . . . ." Id. at 35. No such ambiguity exists in the contracts at issue.

Valero was not coerced to bid for or perform these contracts, and the assertion that DESC "abrogated Valero's rights" by awarding lucrative contracts in a proprietary capacity refutes itself. Pl. Br. 47 n. 50. No authority supports the argument that such free exchanges of a commodity for money in a competitive market can be recharacterized, years after the fact, as a compensable Fifth Amendment taking if the private seller can find some way to undo what both parties understood to be the contracts. Further, even if Valero were to prevail, as the Federal Circuit held in Barrett, only the pricing mechanism would be stricken. The remainder of the agreements, including the Government's right to receive the fuel, would stand, or would, at a minimum, be "implied in fact" from the parties' conduct. Accordingly, there is no basis upon

which to allege the fuel was "taken" for use by the sovereign within the meaning of the Constitution.

IV. Valero's Small Business Program Complaints Must Be Dismissed

A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint

In our moving brief, we demonstrated that this Court possesses no jurisdiction to entertain claims based upon the Fifth Amendment's equal protection clause. Valero claims to skirt that rule, because it has "express contracts" tainted by the award. Pl. Br. 54. But, here, Valero has no award based upon any purported equal protection violation.[17] Moreover, the test is not whether a contractor has a contract, it is whether the contract "underlies its claim." Trauma Service Group, 104 F.3d at 1324. Here, Valero's contract is, at best, incidental to its claim, which concerns the award of set-aside portions it presumably was not awarded. By contrast, the cases upon which Valero relies, such as Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983), Gould v. United States, 67 F.3d 925 (Fed. Cir. 930 (Fed. Cir. 1995), and Trauma Service Group, concern claims that contract terms (including their proper interpretation in light of applicable statutes or regulations) were illegal or supported the requested relief. See, e.g., Trauma Service, 104 F.3d 1321, 1325 ("TSG contends the MOA is an express contract"); Gould, 67 F.3d at 929 ("The illegality in this case, if there is one, turns on questions of fact and the terms of the contract in dispute"); LaBarge Prods., Inc. v. West, 46 F.3d 1547 (Fed. Cir. 1995) (pricing provision formed in violation of an auction procedure was reviewable). Here, Valero has failed to identify any of *its* contract terms that were written in violation of any statute or regulation.

[17] A further symptom of the sheer creativity of the complaint is Valero's failure to include any evidence that the premise of its argument has any basis in fact, such as a declaration or document explaining how the purported violation affected its contracts.

Valero also insists that the "Federal Circuit already has expressly held that there is Tucker Act jurisdiction over this precise type of claim." Pl. Br. 54 (citing Rothe Dev. Corp. v. United States Dept. of Defense, 262 F. 3d 1306 (Fed. Cir. 2001)). However, this is not a Rothe claim. Rothe was a disappointed bidder. It did not seek damages arising from a contract, nor did the court assert its jurisdiction on that basis. Rothe alleged that the application of a 10 percent evaluation preference to a small disadvantaged business bid deprived Rothe of obtaining a contract. Thus, it was upon its bid protest jurisdiction (then based upon the premise that, "[u]nder the Tucker Act an unsuccessful bidder can recover its bid preparation costs from the Government on the theory that failure to evaluate a 'bid honestly and fairly' breaches an implied-in-fact contract of fair dealing") that the court entertained the appeal. Rothe, at 1317 (citing Coflexip & Servs., Inc. v. United States, 961 F. 2d 951, 952-953 (Fed. Cir. 1992)). By contrast, Valero's claim alleges that the Fifth Amendment (which, if anything, would have deprived Valero of a contract) entitles Valero to recover damages for supplies that it provided pursuant to an express contract. Pl. Br. 54-5 (the Fifth Amendment claim "relates to its express contracts with DESC"). Rothe provides no grounds for this Court's jurisdiction.

Valero's claim also lacks a proven factual premise. Its stated premise is that the "contracts contained an illegal term that resulted in it receiving less than fair market value for the fuel it sold to DESC." Pl. Br. 55. However, Valero identifies no term of its contract that violates the Fifth Amendment. That is not surprising, because the preference clause is inoperative in a contract awarded to a contractor, such as Valero, that does not obtain the evaluation preference. For firms that actually obtain the preference, the relevant clause requires that the resultant contract be performed by a qualifying minority owned concern. See, e.g., SA 5 (I237.05(a))("SDB concerns must supply petroleum product from an SDB manufacturer, who

complies with the petroleum product size standards at 13 CFR 121, to be eligible for the evaluation preference")).

B. DESC's Small Business Program Is Not Improper

Valero argues that DESC's match price method for conducting partial small business set aside procurements violates the Office of Federal Procurement Policy ("OFPP") Act, 41 U.S.C. § 423, the FAR "prohibition" on auction techniques, and the FAR's method of awarding the set-aside portion of the procurement separately. Pl. Br. 56-62. We demonstrated in our moving brief that the DESC program follows published guidance, did not constitute a prohibited "auction," and had no effect upon Valero.

An "auction" is the "direct bidding of price between two competing offerors." DGS Contract Servs., Inc. v. United States, 43 Fed. Cl. 227, 239 (1999). The contracting officer's declaration explains that there is no such auctioning.[18] Rather, the small business offeror is given the opportunity to match the price the Government otherwise would pay, adjusted for the transportation cost the Government would incur. The offeror agrees to match or not. If it does, the offeror is awarded the set-aside portion. The result it there is no back and forth between one offeror and another. If and when that ever occurred in a solicitation in which Valero participated, that meant that Valero would have been awarded no contract for that amount. This method is consistent with the FAR and authorized agency clauses, which we have reproduced at SA at 4-17, and is contemplated by 41 U.S.C. § 423 (b)(3), the initial version of which provided that information may be released to "a person authorized by the head of such agency or the contracting officer." 41 U.S.C. § 423 (b)(3).

[18] The declaration is supported by the relevant clauses at SA at 4-17.

The statute was amended in 1996, but still authorizes release in accordance with "applicable agency . . .procedures." 41 U.S.C. § 423 (h)(1). As we explained, the Government's match price method of conducting partial small business set-aside negotiations follows authorized agency procedures and the FAR itself. Thus, for example, FAR 52.219-7(b)(3) provides that: "The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s)." SA at 10 (emphasis added). The clause further provides that "negotiations" will be conducted with the small business offerors to achieve this result. Valero fails to explain how this clause would work unless the contracting officer were to disclose the match price. Similarly, the DESC clause I237.07 provides that “The price for the set-aside portion of this procurement will be negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation charges and other factors.” SA at 4.

In addition to its lacking any basis in fact (i.e, that there was any auction affecting any of its contracts), Valero’s argument is flawed by its premise that there is an outright ban on price disclosure. See Pl. Br. 58 (asserting that DESC’s program violates FAR 15.610(d)(3) because it “indicat[es] to an offeror a cost or price that it must meet to obtain further consideration” and “otherwise furnish[es] information about other offerors’ prices”). First, the FAR disclosure prohibitions at issue concern “auctions.” As we have shown, DESC’s small-business program is not an auction. Second, as we have shown, the particular disclosures at issue are authorized. Third, there is no general ban on price disclosure. See MTB Group, Inc., B-295463, 2005 CPD ¶ 40 at 2 (neither the OFPP Act not the FAR contain an "absolute prohibition against disclosure of

price information, and both make clear that prices can be disclosed under certain circumstances") (citing DGS Contract Servs., 43 Fed. Cl. at 236).

Valero also complains that DESC should award the set-aside procurement separately from the rest of the procurement. Pl. Br. 59-64. As we explained in our motion, the Comptroller General has found that DESC's procedures are consistent with applicable law and regulation. B-230556, March 23, 1989. SA2 35-36.[19] In any event, Valero has not shown how it might ground its generalized complaint concerning the conduct of procurements generally in a cause of action arising out of one of its contracts. Accordingly, it has failed to state a cause of action.[20] In addition, as the attached declaration from the contracting officer demonstrates, the solicitation for six contracts awarded to Valero and included in its claim, did not contain any set aside quantity. SA2 at 77. Thus, Valero's complaint regarding the alleged illegality of DESC's small business set aside or preferences have no factual basis whatsoever regarding these solicitations and contracts.[21]

[19] Valero's assertion that the GAO decision was issued before the OFPPA is unavailing. Pl. Br. 62. First, the deviation is not relevant to whether a match price set-aside constitutes an auction. Second, the prohibition of auctions existed in FAR 15.610, well before the opinion was issued. See SA2 at 74-75.

[20] Its purported basis is that large business concerns "are forced to bid low enough that small businesses will not accept the resulting match price offered to them, thereupon the award remains with the large business as the otherwise successful offeror." Pl. Br. 64. However, Valero provides no evidence in support of its speculative argument and, therefore, the time has come for it to be dismissed. Moreover, the FAR itself provides for matching awards. Thus, we fail to see the basis for characterizing a purported bidding strategy aimed at excluding small businesses as "forced." In any event, we see no reason why any business would lower its offer specifically to contend with small-business set asides, when there are other competitors, including small businesses who bid on the non set-aside portion, with which to contend before final award.

[21] Valero's insistence that it requires discovery regarding deviations and that the contracting officer's declaration is "troubling" and a "reversal of position" (Pl. Br. 61) is a straw man that avoids our principal arguments. Valero consistently conflates and confuses its auction argument

V. Waiver and Estoppel Bar Valero's Claims

A. Introduction

Our moving brief established that, even if the FAR were to confer some unrealized right, Valero elected to accept the pricing clause it did and, through years of inaction, now is estopped from pursuing any such imagined right in litigation. Our moving brief also demonstrated that Valero's alternate illegality arguments and the common law causes of action are based upon the same faulty premise, i.e., that the Government has a legal duty to use escalators based upon price references that are "intended or designed" to be used as prices references, and to ensure that contracts result in payments that the contractor is satisfied amount to "fair market value" rise or fall with Valero's illegality allegation.

---

with its "must first award non set-aside quantities" arguments -- both in its affirmative case, its criticism of our argument, and its assertion that discovery is required. See, e.g., Compl. ¶ 31; Pl. Br. 60 ("DESC's match price system violates the FAR because it discloses competitors bid or pricing information"). Concerning the merits of Valero's auction argument, our point is simply that a match-price set-aside is not an auction and the DESC deviation clause is irrelevant to that argument. The contracting officer was correct in stating that the DESC practice was substantially the same as the FAR clause, inasmuch as it permits awards based upon matched prices, as he explained. Regarding the "award first" argument, our argument is that Valero has failed to explain how any purported violation affected its contract. Our moving brief explained that we were "mystified" by Valero's point, but cited DFARS 219, and attached the specific clauses (labeled "(Deviation)"), which set forth the precise manner in which DESC administered set-aside awards. We also referred to the GAO's 1988 review of the DESC clauses, its recitation of how they differed from the FAR, and the GAO's observation that DESC obtained a deviation in 1987, and had a substantially similar one since 1960. SA2 at 36, 38. The opinion also explains that the clauses operated somewhat differently than the FAR, in the manner Valero alleges. SA2 36 ("[Under the FAR], [t]he set-aside portion is negotiated with qualified small business[es] who have submitted responsive offers under the non set-aside portion. Under the DFSC procedure, both large and small firms compete by submitting offers on total quantities. and that it "compl[ied] with the Small Business Act and other federal procurement laws and regulations." SA2 at 36. Valero's also attempts to prolong the litigation, asserting that we are obliged to detail the history and propriety or each element of the deviations. We have no such obligation. Valero has failed to demonstrate it could profit by even an admitted violation.

In Hermes II, 58 Fed. Cl. 409, this Court held that the contractor's allegation that the PMM violated the FAR could be waived. See also Sunoco v. United States, 59 Fed. Cl. 390, 398 (2004) ("Having dissected both Type I and Type II cases, the Court adopts the Type II rationale. The mere existence of the Type II line of cases shows that waiver of contract illegalities by government contractors is, at the very least, possible in some cases."); Calcasieu v. United States, 2003 WL 22049528 at 11 ("This court draws from *AT& T III* and *V* the cautionary lesson that waiver may apply in the circumstance of this case, given an appropriate record").[22]

The Hermes II Court also held that the requisite "intelligent waiver" could be discerned from the contractor's general sophistication and lengthy failure to signal its dissatisfaction whatsoever. Id. at 416-18. As the Court observed:

> It is almost universally conceded that "'wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse . . . . As a general proposition, one side cannot continue after a material breach by the other . . ., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.'"

Id. at 418 (citing Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26 (1972)); see also Hermes II, 58 Fed. Cl. at 413 (a "key factual distinction" to be that Hermes "astonishingly waited

[22] Both Sunoco and Calcasieu deferred a final ruling on the waiver issue, pending additional discovery. Other judges of the Court have disagreed about whether the claims could be waived. See, e.g., Tesoro v. United States, 58 Fed. Cl. 65 (2003), La Gloria v. United States, 56 Fed. Cl. 211 (2003), Gold Line Refining v. United States, 54 Fed. Cl. 285 (2002) (same judge following La Gloria), Navajo v. United States, 58 Fed. Cl. 200, 213 (2003) (same judge following La Gloria). However, the Court in Tesoro certified the question for interlocutory review (although, because the Federal Circuit concluded that the PMM-based was legal, the waiver question was not reached in the appeal).

fourteen years after entering the first PMM-based contract before suing in this court, and waited eight years after entering the last PMM-based contract before litigating").

As explained in our original motion for summary judgment, estoppel also is applicable. Estoppel requires that the party asserting estoppel rely to its detriment upon its opponent's action or inaction. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978). Here, because of its superior knowledge of its circumstances, and its extensive experience with the clauses at issue, Valero was in the best position to assess the efficacy of the EPA clauses regarding its own situation (including any inherent uncertainty that might have existed). By adopting the EPA clauses in its offers with the text of the FAR available to it for consultation, Valero signaled its intent to forego any benefits contained in the FAR. That Valero continued to offer these clauses, coupled with its failure to protest clearly prejudiced the Government, because, as subsequent events showed, the Government could have obtained a deviation. Either of these would have been a "relatively painless alternative" to the after-the-fact, competition-free, speculative recovery Valero now seeks. Indeed, as did the contractor in Ling-Temco-Vought, Valero has "in effect retained all options for itself . . . made its calculations entirely in its own favor, without proper consideration of the defendant's position," and violated the "basic principle calling for fair treatment of both parties." 201 Ct. Cl. at 148, 475 F.2d at 638.

In its response, Valero insists that waiver has not been proven and that, as a matter of law, may not be proven. However, as we did in Hermes II, we have demonstrated all that we must to prove waiver. Given the opportunity to rebut our evidence, and to demonstrate that it did not intend to waive any presumed benefit of FAR 16.203-1, and is not estopped from pursuing that benefit now, Valero fails to adduce any fact that might prevent the entry of summary judgment. Valero also fails to demonstrate the need for discovery. In Calcasieu v.

United States, No. 02-1219c (Fed. Cl.) (Order of March 6, 2006), this Court agreed that an identical application also failed.

B. Valero Has Waived Its Claims As A Matter Of Fact

The key factor to be established in a case involving the waiver of a regulatory benefit is the contractor's presumed knowledge of the regulation. Hermes II, 58 Fed. Cl. 409, 416. Here, Valero is presumed to have knowledge of the FAR, especially those portions relating to its contract pricing. Indeed, the content of the FAR provision at issue was fixed well before Valero executed its first contract, and Valero never complained that the EPA clause was ambiguous or functioned in a manner other than that suggested by its plain language. Estoppel is established by Valero's persistent silence and the inherent prejudice to the Government of Valero's complaining now that it objects to contracts awarded and performed years ago.

In an effort to demonstrate that it has not waived, Valero relies principally upon the declarations of a Diamond Shamrock sales manager, whose declarations assert that: (1) "Diamond Shamrock did not . . . intend that it would be paid less than fair market value or at any time intend to relinquish the right of payment of fair market value;" and (2) "Diamond Shamrock was not aware at the time it entered the fuel contracts that DESC awarded the contracts in violation of law." Pl. App. 639. A second declaration states that Valero filed claims when it "first learned that remedies were available to permit payment of fair market value in accordance with what I understand was Valero's intent in entering the contracts." Pl. App. 644 (emphasis added).

None of these allegations indicate that further discovery is required. All are insufficient to prevent a finding of waiver. First, the declarations are based upon the conclusory and erroneous legal premise that Valero's contracts were illegal, and that Valero enjoyed the right to

the payment of "fair market value," a term the declarants do not define. See Behm v. United States, 68 Fed. Cl. 395, 407 (2005) (conclusory declaration does not create issue of uncontroverted fact). In fact, the declarants do not assert that any Valero revenue expectation was not met or that Valero was not paid fair market value. As we have explained, contract prices were those offered by Valero, according to an unambiguous pricing provision. Valero has never asserted that the provision was incomprehensible, misperformed, or that it failed to meet expectations. So general and lacking in personal knowledge are the declarations that they fail to identify the illegality or deficiency that might have contradicted Valero's alleged "intent." This should come as no surprise, inasmuch as the declarations are evidently not intended to reflect the declarants' personal views. As this Court has explained, an "allegation of its intent not to waive a claim when it signed the modifications is insufficient to raise a genuine issue of material fact so as to preclude summary judgment for the government." Safeco Credit v. United States, 44 Fed. Cl. 406, 420 (1999): As such, the declarations are insufficient to contradict our motion.

Apparently unable to assert directly that it lacked critical knowledge, Valero relies upon its consultants' report to "infer" Valero's intent not to waive – principally, the consultants' observations that: Valero had "only" eleven "annual observations" of the PMM; that there is a "random [PMM] variation with the marketplace;" and Valero "could not have understood that its bids would consistently receive less than fair market value." Pl. Br. 69-70. Valero misses the point. Even assuming (it never having been claimed directly) that a contractor as large and experienced as Valero consistently intended one result and achieved another, Valero has not established that it did not know that the regulation at issue existed, and that it did not intentionally agree to a contract that included a PMM-based clause.

Moreover, the consultants' report is an unsuitable vehicle for establishing Valero's intent and knowledge. The report's very conclusion underscores that – because, although the consultants might very well have discouraged Valero from entering into contracts with PMM-based EPA clauses, when Valero had to make a business judgment, it reached the opposite conclusion. Indeed, if Valero's knowledge of the information offered by its consultants was important, presumably, Valero would have gathered that knowledge, or (more likely) did so, and determined that it was not material.

The consultants' report also is unsuitable, because it does not establish even what it purports to measure, i.e., whether the PMM EPA clause is "market-based." As we explained in our response to Valero's proposed facts and in our discussion of the facts above, the consultants' report is based upon an apples to orange comparison of unspecified Platts data that tracks the spot market and an industry-wide census that tracks all sales, the PMM. See Def. Response to Pl. PFF 18. Thus, the fact that changes between certain PMM data and certain Platts data may not match is irrelevant – both to the legality of the clauses at issue and, evidently, to eight years of Valero business judgment. Indeed, FAR 16.203-1 requires only that established prices-type adjustments be "based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items." It does not require particular price references or ones that are identical to each other.

At best, Valero's consultants have demonstrated that, in general, a contractor might make an error in judgment concerning a future fact, i.e, specific payments, but that is not the basis for voiding 36 contracts years after performance.

Underscoring the lengths to which it must go to keep this litigation afloat, Valero seeks to rebut the contracting officer's declaration that Valero did not object to the legality of the

PMM, by focusing upon the fact that Mr. Walker did not "allege that he was involved in a *single one* of Valero's contracts." Pl. Br. 71. What is startling about this is the fact that Valero knows very well that Mr. Walker was involved with its contracts. Indeed, his signature appears on contract documents in Valero's appendix as the awarding contracting officer. Pl. App. 679, 766, 798, 812, 940, 983, 991.[23] What is more startling is the fact that, given the opportunity to directly rebut Mr. Walker's statement, Valero has failed to do so. Accordingly, for the purposes of our motion, it now can be taken that Valero failed to protest the inclusion of PMM in its contracts.[24]

Valero's final effort to rebut our waiver defense is its "unclean hands" conspiracy theory. Pl. Br. 72-73. As we explained in our recitation of the facts, above, the theory is that: DESC

[23] In a footnote, Valero declares it has established the "inaccuracy" of Mr. Walker's statement in a similar case, Calcasieu v. United States. Pl. Br. 71, n. 73. In fact, there is no apparent conflict in the document Valero offers in opposition to Mr. Walker's statement. The document is a letter from DESC to Calcasieu, not a letter of complaint from Calcasieu. From the response, it appears that Calcasieu was not complaining about the accuracy of the PMM, but its ability to determine its offer price when the PMM was not yet available for the reference month. Pl. App. 96. DESC resolved this problem in 1987 when it changed the reference month. SA at 20, 25.

[24] Instead, Valero relies upon the allegation that DESC had received objections to PMM from "suppliers" as early as 1984. Pl. Br. 71. Valero also asserts that "every known objection was rejected out of hand." Id. In fact, what Valero is referring to is the complaint of the plaintiff in MAPCO, which asserted that the PMM was "non-indicative of our marketplace," and noted its unique situation, i.e., its location in Alaska and non-access to continental markets. Pl. App. 205. However, neither Valero (nor any other contractor it has identified) has made any such objection or explained the relevance of MAPCO's situation to its own. The "rejection" to which Valero refers is a DESC internal memorandum, explaining that its policy was to have common "EPA references." Pl. App. 205. The memorandum explained that the "[u]se of different escalation references in a competitive procurement renders meaningful price evaluation in a competitive procurement difficult, if not impossible," but that, "in the case of Alaska, the proposed common escalation reference may not be obtainable . . . [Thus,] [i]f the proposed EPA reference is rejected by all Alaska based offerors, a common EPA reference based on Alaska product postings will be appropriate." Pl. App. 205. In short, the problem was with the Alaskan market, a common reference was required for competition purposes, and, if that was not obtainable, DESC was prepared to accept something else. None of this pertains to Valero.

knew that its use of the PMM was corrupt; DESC concluded that the price of fuel would, in the future, move in one direction; the PMM and all of the references DESC used would report movement in the opposite direction; that movement always would favor DESC's customers; and, somehow, the fuel industry never would detect this or, upon learning it, bid eagerly nonetheless. As we explained, not only is the story not credible, it depends upon partial quotations and innuendo not supported by the evidence.

C. Valero Has Waived Its Claims As A Matter Of Law

Valero argues that it may not be prevented from asserting its entitlement to a legal price, relying upon: (1) the principle that an illegality concerning the effectuation of a national purpose may not be waived (citing cases such as Pittsburgh C.C. & St. L. Ry. Co. v. Fink, 250 U.S. 577 (1919); Sprague Steamship Co. v. United States, 172 F.Supp. 674 (Ct. Cl. 1959); Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983)); (2) cases holding that, where a rule is made for the protection of contractors, it may not be waived (Beta Sys., 838 F.2d 1179, and its progeny, including Cessna Aircraft v. Dalton, 126 F.3d 1442 (Fed. Cir. 1997)); (3) the absence of a statute limitations (citing Thomas v. United States, 125 Ct .Cl. 76, 80 (1953) and Louisville and Nashville R.R. Co. v. Cent. Iron and Coal Co., 265 U.S. 59, 65 (1924)).

These are the same arguments that were rejected in Hermes II. Valero's central premise is that contractors may not waive clauses such as this one. But, it is well-established that public contractors may waive rights and benefits, and may be estopped from belatedly seeking to reassert them. E.g., Shutte v. Thompson, 82 U.S. 151 (1872). Even statutory benefits may be waived. United States v. Mezzanatto, 513 U.S. 196, 201 (1995) ("Rather than deeming waiver presumptively unavailable absent some sort of enabling clause, we instead have adhered to the opposite presumption."). Overcoming that presumption requires a showing, deducible from the

text of a statute or legislative history, that Congress itself intended to preclude waiver. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985); accord Rough Diamond Co. v. United States, 351 F.2d 636, 639 (Ct. Cl. 1965) ("the basic test in deciding whether a purchaser could recover would always be the particular Congressional will reflected in the particular piece of legislation under scrutiny"). The burden is on the party opposing waiver to show that Congress intended to preclude it. Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987).

To be sure, where Congress has clearly expressed broad public policy, courts are reluctant to permit the evisceration of that policy by the parties' consent. See Clark v. United States, 95 U.S. 539 (1877) (refusing to permit waiver of statute designed to "prevent and punish fraud" by requiring contract to be in writing); Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983) (statutory prohibition against cost-plus-percentage-of-cost contracts). But, a party does not thwart public policy by declining a benefit contained in a regulation or other law. Brooklyn Sav. Bank v. O'Neill, 324 U.S. 697, 705 (1945); Millmaster Intl. Inc. v. United States, 427 F. 2d 811, 814 (Cust. Ct. 1970) (importers may waive benefits of Tariff Act, because waiver will not interfere with any "manifest statutory purpose").

Not every contracting irregularity, however, requires a contract's *post hoc* invalidation or reformation. In fact, the jurisprudence of this circuit is replete with references to contractor waivers, including Hermes II. E.g., American Telephone and Telegraph Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002) (AT&T V); Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997); E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978) (per curiam); Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 148, 149, 475 F.2d 630, 638 (1973).

In order to determine whether waiver may be found, a case-by-case analysis is required. The Restatement (Second) of Contracts explains this analysis as follows:

> (1) . . . an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against enforcement of the term.
>
> (2) In weighing the interest in the enforcement of a term, account is taken of:
> (a) the parties' justified expectations,
> (b) any special public interest in the enforcement of the particular term.
>
> (3) In weighing a public policy against enforcement of a term, account is taken of
>
> (a) the strength of that policy as manifested by legislation [including regulations] or judicial decision,
> (b) the likelihood that refusal to enforce the term will further that policy,
> (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and
> (d) the directness of the connection between that misconduct and the term.

Restatement § 178.

Given the facts here – that: there is no congressional statement of purpose; that the public is unaffected by Clause B19.33 (it cannot be shown to either over or understate prices, nor to dampen competition); Valero, an experienced refiner, bid with full awareness of the escalator; Valero never complained about B19.33; Valero continued to bid on the contracts; and Valero did not submit a claim until one contractor prevailed upon a since-invalidated cause of action -- the analysis could not advance Valero's case.

Moreover, where a rule affecting a contract's formation or administration is waivable, a contractor cannot simply continue contract performance, without protesting the breach, or it will

be deemed to have waived. Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 637 (Ct. Cl. 1973); accord Federal Elec. Corp. v. United States, 486 F.2d 1377 (Ct. Cl. 1973). E. Walters & Co., Inc. v. United States, 576 F.2d 362 (Ct. Cl. 1978), is the controlling application of this rule. There, a supplier claimed that the Government had violated a FAR predecessor (the ASPR) by exercising an option that, in effect, permitted the Government to procure additional fuses at a lower price than if it had purchased the entire amount in a single order.[25] The ASPR prohibited the Government from exercising an option when "the option quantities represent known requirements for which procurement funds are available," and the Government had just such a requirement. 576 F.2d at 365. Based upon the ASPR, Walters assumed that the option would not be exercised for the funded requirement. Later, Walters learned that its assumption was wrong, but it said nothing when the Government exercised the option. After delivery, Walters submitted a claim seeking the higher price. The contracting officer and the board of contract appeals concluded that the claim was waived. Id. at 366.

On appeal, the court held that the option provision was "in direct conflict with" the ASPR, but that Walters consciously chose to "fully perform the contract as if there were contemporaneous agreement of the parties on the proper interpretation of the terms of he [solicitation]," and "the Government was prejudiced." Id. at 368. The court first stated that the provision at issue was not actionable, but added: "Nor did plaintiff timely protest the exercise of the first option. The board was correct in characterizing this silence until after final delivery as a waiver." Id. at 367. The court added:

[25] The price schedule included price ranges such that unit prices increased with order size. The solicitation specified, however, that the Government could order a base amount, then, at its option, purchase an additional 50 percent of the base amount at the base price.

> [T]he doctrine of estoppel is also for application. Had plaintiff protested the use of the option provision at the time of award, defendant would have been in a position to either reaffirm its use of the option provision, in apparent disregard of the ASPR prohibition, with the further knowledge that it could later be faced with a claim for the [higher] price; or it could have elected instead, to award the non set-aside quantity in the next least expensive manner . . . . Plaintiff's silence deprived the Government of that relatively painless alternative.

Id.

Walters reflects well-established logic in this circuit. In Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997), for example, the contractor attempted to avoid the payment terms of an option it had performed, alleging the option was invoked in violation of DAR §1-1502(b)(ii). Although it assumed a regulatory violation, the court, following Walters, rejected the claim because the contractor substantially completed the contract before asserting its claim. This, the court held, "constituted a waiver of the grounds for rescinding or voiding the contract because of a violation of the regulation, even assuming the option clause indeed violated the regulation." 124 F.3d at 1446. A contractor cannot recover "where it fails to raise the problem prior to execution, or even prior to litigation . . . ." Id.

Valero seeks to distinguish Whittaker, by arguing that the waived violation was not "inherent in the award of the contract." Pl. Br. 84. As the Hermes court explained, however, both Whittaker and Walters involved violations of the FAR, every bit as inherent in the award as the provisions here. 58 Fed. Cl. at 15. Indeed, in AT&T V, 307 F.3d at 1381, the Court cited Whittaker and Walters for the proposition that a contractor's failure to "have raised the issues it now presents . . . at the time of contract negotiations" amounted to a waiver. But even if the exercise of the option in Whittaker (and not the award) were the proper focal point, the contractor's waiver occurred when it failed to protest before the option was exercised, a

circumstance indistinguishable from what has occurred here, where plaintiff has failed to provide timely notice of the alleged illegality.

Similarly, in Union Pacific R.R. v. United States, 847 F.2d 1567 (Fed. Cir. 1988), the court invoked equitable estoppel and refused to entertain a contractor's argument that longstanding contract provisions violated tax laws. The court explained that the railroad could have signed the contract under protest to preserve its claim. Id. at 1570. See also Hartford Accident & Indem. Co. v. United States, 127 F. Supp. 565, 567 (Ct. Cl. 1955) (surety that executed performance and payment bonds with knowledge of terms of Government contract was estopped to assert that contract was executed without authority); PCL Construction Services, Inc. v. United States, 41 Fed. Cl. 242, 252 (1998) (contractor waived objection to provision that "was apparent on the face of the solicitation").

In American Telephone & Telegraph Co. v. United States, 177 F.3d 1368 (Fed. Cir. 1999) (en banc) ("AT&T III"), Judge Plager's opinion (dissenting-in-part, concurring-in-part) explained the logic underlying the Walters approach. There, AT&T asserted that its contract was void ab initio, because the Navy failed to take the steps necessary to authorize its contract as a fixed-price contract. Id. at 1371. Thus, AT&T claimed, it was entitled to relief in quantum meruit. The majority disagreed, explaining that the law does not favor invalidation of a fully-performed contract, based upon governmental noncompliance with internal reporting procedures. Id. at 1375-76. Judge Plager would have held that the contract was invalid, but would have denied a remedy, because AT&T was aware of the missing authorization, and bid nonetheless.

In words firmly rooted in the logic of Walters that are applicable here, Judge Plager explained the reasoning behind waiver:

> AT&T has no rightful claim to another penny of public money. It agreed to build and sell a product to the Government for a fixed price. It performed its end of the deal, and delivered the goods. The Government likewise performed its part of the deal; it paid AT&T the agreed-upon price . . . .
>
> AT&T now seeks to take advantage of the fact that the deal it made with the Government did not result in an enforceable contract, which it likely knew (and certainly should have known) when it proposed to enter into the agreement. AT&T demands more money for which it has been fully paid to do. The answer to that facially nonsensical demand is, in a word, "no."

Id. at 1383-84.

Failing to show that a FAR 16.2 violation is not waivable, Valero relies upon Chris Berg, Inc. v. United States, 426 F. 2d 314 (Ct. Cl. 1970), and its offspring, Beta Systems, 838 F. 2d 1179, LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1557 (Fed. Cir. 1995), and Cessna Aircraft Co. v. Dalton, 126 F.3d 1442 (Fed. Cir. 1997), in which it was held that contractors were not bound by their estoppel, acquiescence or failure to protest. These do not relieve Valero of its analytical burden. First, the rule cited in Chris Berg was developed in a series of cases arising under the Merchant Ship Sales Act of 1946, a statute that the court held involved important public policy. Those cases, including Nautilus Shipping Corp. v. United States, 141 Ct. Cl. 391 (1958), and Rough Diamond, 351 F.2d 636, concerned contracts for the sale of Government-owned vessels, by which ship purchasers contracted to pay higher prices than specified by the Act. In ordering refunds to the purchasers, the court held that the statute embodied a strong and clearly discernable congressional purpose. As the court summarized its rulings years later:

> The marine statutes, we thought, embodied the Congressional wish that the Government's surplus ships should be sold at prices, uniform for all purchasers, and ascertainable by mathematical application of the statutory formula, properly interpreted; this Congressional purpose was strong enough to override any general legal doctrine, applicable in other situations, but which, if applied

> in the instant situation, would result in different persons paying different prices for the same type of ship . . .

Rough Diamond, 351 F.2d at 639-40 (internal quotation marks omitted). There is no legislative mandate regarding the EPA clauses at issue. It simply is not a matter of national consequence when a seller agrees to an escalation clause.

Second, Chris Berg and Beta involved Government overreaching in the face of timely protests by contractors who insisted that the law be observed. Chris Berg was a mistake-in-bid case, a unique species of cases. There, the question was how to treat a bid mistake, and the contractor insisted from the outset that the mistaken bid was its intended bid. In Beta Systems, there was similar overreaching, as the contractor protested, at the outset, the Government's refusal to write the contract as the contractor insisted the regulation required. Here, there is no question concerning the intent of Valero's offers or satisfaction with its contracts. Third, estoppel could not lie in these cases, as both contractors timely protested the clauses at issue. Thus, statements in those cases concerning acquiescence or failure to protest is dicta.

Reliance upon LaBarge, 46 F.3d 1547, and Cessna, 126 F.3d 1442, also is inapt. In Cessna, waiver was not at issue, because the regulation was held not to confer a benefit upon the contractor. In LaBarge, 46 F.3d 1547, the Court was asked to determine whether a contractor, who alleged its bid was the product of an improper bid auction, had raised a contractual theory that satisfied the board's jurisdictional requirement. The Government asserted that the contractor had failed to do so, and that its allegations were of the kind "ordinarily made in pre-award bid protests, not after the award of contract." Id. at 1552. The Court responded by citing Chris Berg for the proposition that an unlawful contract may be the basis for a claim, even if accompanied by initial adherence to the unlawful contract. Id. However, on the merits, the

Government argued that the contractor had waived any such cause of action. Id. at 1556. That argument, however, the Court specifically refused to entertain, inasmuch as it found no illegal auction or harm to the contractor. Id. Notably, the Court did not reject the argument out of hand, as being precluded by Chris Berg or its progeny. Thus, LaBarge cannot be cited as authority for a no waiver rule. Moreover, as the Hermes I Court noted, LaBarge complained in a bid protest and "did not significantly delay any legal challenge" to the Government's actions, as Valero has here. 58 Fed. Cl. at 14.

Valero's attempts to draw support from the statement in AT&T III, that, concerning unlawful contracts fully performed, "courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory." 177 F.3d at 1376. Although that may be true in general, it does not address whether a remedy may be barred if waived. In fact, even in the AT&T litigation, the lower court eventually adopted none of those alternatives and dismissed the case for lack of an enforceable claim.

Valero also purports to have debunked the applicability of Federal Crop Ins. v. Merrill, 332 U.S. 380 (1947), one of the bases of the Hermes II decision, arguing that it cannot support Valero's presumed knowledge of the law, because, under that reasoning, it also should be presumed to know it is entitled to receive a "legal" price, but could not have known that its contracts were illegal when signed. But, contractors are deemed to know the law. Federal Crop Ins., 332 U.S. 380. Here, Valero waived its claims because it knew that the EPA clauses were in its contracts, and that the clauses were based upon the PMM.[26]

---

[26] Valero also appears to assume that waiver could not occur until a court interprets a regulation, arguing that it filed a claim as soon as it knew such lawsuits could be filed. But, if that were the rule, the doctrine of presumed knowledge of the law would be eviscerated. Hermes II, 58 Fed. Cl. at 416-17.

Valero argues that Hermes II "proves too much" because a "contractor could never seek a remedy under an illegal contract." Pl. Br. 82. But, that does not follow logically from Hermes II at all. Its holding was that a contractor knowing of a legal deficiency in its contract may not sleep on its rights. Valero's reliance upon Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173 (1942), Pittsburgh Ry. Co., 250 U.S. 577, and Louisville and Nashville R.R. Co., U.S. 59, 65 (1924), Costanza Coal Min. Co. v. Weirton Steel Co., 150 F.2d 929 (4th Cir. 1945), cases where courts refused to apply waiver, is inapposite, because the issue in those cases was whether a particular law (national pricing schemes of great importance to the public) could be waived. Thus, the very element missing from Valero's analysis here, (i.e., that the rule is a matter of important public policy) was the deciding factor in those cases. See, e.g., Sola Electric, 317 U.S. at 177 ("Local rules of estoppel which would fasten upon the public as well as the petitioner the burden of an agreement in violation of the Sherman Act must yield to the Act's declaration that such agreements are unlawful, and to the public policy of the Act which in the public interest precludes the enforcement of such unlawful agreements"); Costanza Coal, 150 F.2d at 935 ("The purposes are stated in Sec. 1 of the Act wherein it is declared that regulation of the sale and distribution of bituminous coal is imperative for the protection of interstate commerce and such coal, and that existing practices of distribution and marketing thereof waste the resources of the nation and disorganize interstate commerce therein so that regulation of prices and unfair methods of competition are necessary").

Finally, Valero argues that waiver should be precluded on the basis of the Christian doctrine. Pl. Br. 75-76. Christian does not apply to every regulatory provision, however – only those "mandatory clauses that express a significant or deeply ingrained strand of public

procurement policy." General Eng'g. & Mach. Works v. O'Keefe, 991 F. 2d 775, 779 (Fed. Cir. 1993). No such strand has been identified or seems apparent.

CONCLUSION

For these reasons, defendant respectfully requests that the Court dismiss the complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

DONALD S. TRACY
Trial Attorney
Defense Supply Center
Richmond, VA

April 7, 2006

CERTIFICATE OF FILING

I hereby certify that on April 7, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Steven J. Gillingham