cumulative tabulation of gross gallons of gasoline reported by wholesale distributors to State motor fuel tax agencies. The FHWA collects information on finished motor gasoline, with no distinction made among motor gasoline grades. The data include gasoline for both highway and non-highway use. The FHWA includes gasohol but excludes exports, fuels for military use, and dealer transfers.

The Bureau of Labor Statistics (BLS) publishes the aggregate index for household fuels and its component indexes for motor fuels. Retail prices are collected monthly by BLS representatives in the urban areas, and support the estimation of the Consumer Price Index (CPI). Wholesale prices are collected monthly and support the estimation of the Producer Price Index (PPI).

The CPI and PPI use fixed volume weights to measure the change in price over time. The CPI measures the change in prices for a defined market basket of goods and services and the PPI measures the change in prices received by domestic producers for their output. Approximately 900 retail prices are collected for regular grade gasoline in approximately 87 urban areas across the country and include all taxes directly associated with the purchase and the use of the items. The 87 areas cover 39 States and the District of Columbia. The PPI collects prices from a sample of domestic refiners. Although most PPI prices are collected on one particular day of the month, the prices for refined petroleum products are commonly an average of prices during the first 10 working days of the month, or the prices received by oil refineries on the 10th working day of each month.

Westlaw.

1988 WL 227932 (Comp.Gen.), B- 230,556

**(Cite as: 1988 WL 227932 (Comp.Gen.))**

COMPTROLLER GENERAL

*1 Subject: Defense Fuel Supply Center's Small Business Set-Aside Procurements (B-230556; Code 396917)
September 6, 1988

To: Group Director, NSIAD--John Rinko
Thru: Senior Attorney, OGC--A.R. Kasdan

DIGEST

The Defense Fuel Supply Center's (DFSC) small business partial set-aside procedures for the acquisition of its fuel supplies, comply and are consistent with the Small Business Act, 15 U.S.C. 631 et.seq., as well as other applicable Federal procurement laws and regulations. The DFSC procedures have been approved as deviations from applicable procurement regulations for over 20 years, and we previously considered these procedures as a reasonable exercise of DFSC's discretion. See B-168576(2), April 28, 1971 and B-171289, April 28, 1971.

This responds to your request for our views on the legality of the Defense Fuel Supply Center's (DFSC) small business set-aside practices (procedures) for the acquisition of its fuel supplies. In his letter of January 11, 1988, to GAO requesting this review, Senator Max Baucus questioned whether DFSC's small business set-aside procedures afford small business a fair opportunity to compete for these fuel acquisitions. He has asked GAO to determine whether DFSC's procurement procedures are consistent with the Small Business Act, as well as other applicable Federal procurement laws and regulations. For the reasons given below, we believe that DFSC's small business set-aside procurement procedures comply and are consistent with those laws and regulations.

Background

The DFSC purchases its bulk fuel supplies for the Department of Defense's (DOD) domestic requirements in a non-traditional way. It makes two major buys of bulk fuels with multiple contract awards based on a geographical division of the country: Inland/West and East/Gulf. It uses a bid evaluation model developed in the 1960's and 70's which allows it to select the particular combination of contract awards for a specific buy which will fulfill the government's requirement at the overall lowest cost (product plus transportation cost). Under this model, multiple awards are needed at many locations so that each individual requirement or location can be completely supplied. Usual procedures of awarding contracts to the lowest sources do not provide the least total cost pattern of awards.

DFSC solicitations request offers from all suppliers, including both large and small business firms, for needs of all DOD locations in the particular geographic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

protect the economic interests of small business concerns, and "... to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the government be placed with small business enterprises ..." 15 U.S.C. 631(a). (Emphasis added.) Identical policy objectives are stated in the Armed Services Procurement Act (ASPA), 10 U.S.C. 2301(b), and the Federal Property and Administrative Services Act (FPASA), 41 U.S.C. 252(b), which respectively govern military and civilian acquisitions. Part 19 of the FAR implements the small business acquisition-related provisions of the Small Business Act and the applicable provisions of the ASPA and FPASA. Also, provisions of the DFAR apply to small business set-aside in DOD acquisitions.

*3 To achieve the Small Business Act's "fair proportion policy", both the Act and the FAR give federal agencies broad authority to award contracts to small business, including on a total or partial set-aside basis. 15 U.S.C. 644(a) and FAR 19.5. An agency may not award a contract to a small business firm if the agency's cost would exceed a fair market price, 15 U.S.C. 644(a). [FN2] Relatedly, the FAR set-aside procedures provide that in both total and partial procurement set-asides, the contracts awarded must be made only at reasonable prices. FAR 19.502-2 and 19.502-3. The FAR also requires that specific clauses be inserted for set-aside contracts, i.e., FAR 52.219-6 (total set-asides) and 52.219-7 (partial set-asides). [FN3]

For partial set-asides, FAR 19.502(3)(c) requires that the contracting officer must first award the non-set-aside portion using normal contracting procedures. Both large firms and businesses eligible for the set-aside submit offers on the non-set-aside portion. After the non-set-aside portion is awarded, the contracting officer negotiates with small business firms who have submitted responsive (acceptable) offers on the non-set-aside portion. The set aside portion will be awarded at the highest unit price(s) in the non-set-aside portion. FAR 52.219-7, part (b)(3) of the required contract clause. If a set-aside acquisition is not awarded, the supplies or services for which no award was made is recompeted. FAR 19.507(a).

The DFSC procedures differ from the FAR procedures in two substantial respects which are said by DFSC to be required to effectuate bulk fuel acquisitions. First, the award of set-aside quantities is made at prices which would have been paid without the set-aside. This can differ from the "highest unit price(s)" paid under the FAR. This variance is the result of the nature of the petroleum refining business. In most businesses, prices will often drop as more product is produced. In the petroleum refinery business, the contrary is the case. Since the refining process can produce many products, e.g., jet fuel, gasoline, diesel fuel, etc., increased quantities of one product are produced at the expense of others and the price of additional production rises.

The second difference is that in the event of set-aside failures, the set-aside portion is not recompeted. Under the DFSC procedures both large and small firms are required to submit offers on total quantities just as if there was no set-aside. In this way, in the event a set-aside acquisition cannot be filled, other offers can be considered.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 227932 (Comp.Gen.), B- 230,556

**(Cite as: 1988 WL 227932 (Comp.Gen.))**

Under both the FAR partial set-aside regulation and the DFSC deviation large and small business compete against each other. Under the former, the large and small firms submit offers on the non-set-aside portion which is awarded first. The set-aside portion is negotiated with qualified small business who have submitted responsive offers under the non-aside portion. Under the DFSC procedure, both large and small firms compete by submitting offers on total quantities.

*4 We have found no court cases or GAO decisions or opinions which have specifically addressed the issue whether the FAR partial set-aside procedures are a reasonable implementation of the requirements of the Small Business Act. However, GAO has considered DFSC procedures substantially similar to those in effect today as a reasonable exercise of an agency's discretion. In B-168576(2), April 28, 1971, a small business protested the reduction of the small business set-aside and proposed certain changes in DFSC's set-aside procedures. At that time, DFSC's procedures were a deviation from applicable ASPA regulations. The protestor proposed that the formula DFSC uses to calculate the prices paid for the quantities accepted be modified. Under this proposal, the price for the set-aside would be set on the basis of the prices and quantities remaining on each offeror's bid after subtracting the amount awarded on the non-set-aside portion.

DFSC pointed out that the proposed procedure would not only cost the government more money, but might actually result in lower prices for set-asides as the percentage of the total procurement which is set-aside increases. GAO stated that it would not substitute its judgment for that of DFSC "unless it [DFSC] has acted in an arbitrary or capricious manner." We concluded that based on the record, there was "substantial evidence to support DFSC decision not to revise its small business set-aside procedures," as suggested by the protestor. In B-171289 , also decided on April 28, 1971, GAO concluded that it failed to see how evaluation procedures--substantially similar to DFSC present procedures--would be contrary to the "congressional purpose and intent in establishing the small business set-aside procedure, 15 U.S.C. 631."

In conclusion, we find no reason to question our previous positions that DFSC procedures are in compliance with the Small Business Act and are a reasonable exercise of agency discretion to implement the policy of the act.

Substantially similar DFSC procedures have been approved as deviations from applicable procurement regulations for partial set-asides for over 20 years. Our view is reenforced by information DFSC has provided that shows that the DFSC set-aside procedure results in small businesses receiving an equal to or a higher price for their fuel than under the FAR set-aside procedure.

Finally, we note that Senator Baucus letter referenced the Small Business Act's requirement that small businesses "... shall have the maximum practical opportunity to participate in the performance of contracts let by any federal agency ..." 15 U.S.C. 637(a). However, this section is not applicable to the award of a federal contract, but to insure that small business receive subcontracts under prime contracts the government has already awarded.

Raymond J. Wyrsch

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Senior Attorney, OCG

FN1 Senator Baucus' request stemmed from a specific DFSC fuel acquisition in which one small business firm, the Wolf Point Refining Company, could not meet the offered "match price" for the delivery of JP-4 fuel to the Minot Air Force Base, because to do so would have resulted in a $900,000 loss to the company. The attorney representing the company believes that DFSC's small business set-aside procedure offers little opportunity for small businesses to compete against large firms. In view of the Senator's request for a general assessment of DFSC's procedure, and that Wolf Point did not file a bid protest concerning the Minot fuel acquisition, we will not address this case.

FN2 The Small Business Act also requires that the head of each agency shall establish goals for the participation by small business concerns in the award of its procurement contracts having a value of $25,000 or more, 15 U.S.C. 644(g).

FN3 The DFAR also requires that similar clauses be inserted in DOD contracts, i.e., DFAR 52.219-7003.

1988 WL 227932 (Comp.Gen.), B- 230,556

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONOCOPHILLIPS, | ) | |
| And | ) | |
| CONOCO INC., | ) | No. 02-1367C<br>(Judge Wiese) |
| And | ) | |
| PHILLIPS PETROLEUM COMPANY, | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DECLARATION OF LAWRENCE C. ERVIN

1. My name is Lawrence C. Ervin and I am the Chief of the Office of Market Research, Defense Energy Support Center (DESC). I have held that position since January 2002. From January 1995 to January 2002, I was in charge of DESC's Office of Market Research[1] in its various organizational locations. I joined the Office of Market Research and Analysis in September, 1980, as an analyst, and was employed as an analyst until I was appointed acting director. I was awarded a B.A. in Economics in 1975, and a M.S. in Agricultural and Resource Economics in 1980, both from the University of Maryland.

2. I have reviewed the February 21, 2006 study by Joseph P. Kalt and Peter Killen submitted in this case. At paragraphs 34-43 of their study, the authors criticize the

[1] For a period of time, the office was known as the Office of Market Research and Competition.

formula used in the Petroleum Marketing Monthly (PMM)-based reference price for JP-4 jet fuel. JP-4 jet fuel is a naphtha-based product that also contains product from the kerosene portion of the barrel.

3. The PMM does not publish a price for JP-4 or for naphtha. Naphtha is an intermediate product that can, among other things, be blended into JP-4, or further upgraded for inclusion into gasoline. The PMM does publish prices for gasoline. Because naphtha is a blending component of JP-4 and an intermediate product in the manufacture of gasoline, the price of gasoline is a proxy for the value of the naphtha component of JP-4.

4. The PMM formula relied on kerosene-based jet fuel for the kerosene component of the JP-4 blend. DESC selected kerosene-based jet fuel because it is, by far, the largest volume kerosene type product.

5. Refiners used varying amounts of naphtha and kerosene to blend into JP-4. The 70-30 blend used in the PMM-based clause is within the range of how refiners produced JP-4. I do not recall any of our suppliers questioning the 70-30 formula that we used.

6. Prior to DESC's decision to use a common economic price adjustment (EPA) clause, DESC allowed suppliers to propose their own EPA clause. In many cases, suppliers of JP-4 proposed an EPA clause based, in part, on gasoline prices. I have attached two examples to this declaration. In the first example, Ashland Petroleum Company, Contract DLA600-81-D-0354[2], page 8, proposed the use of its own sales

---

[2] The Ashland contract is the subject of the same type of claim filed by ConocoPhillips. Marathon Ashland Petroleum, LLC v. United States, Fed. Cl. No. 02-1218C. The contract is part of the claim submission.

prices for gasoline and kerosene in a 60 percent – 40 percent ratio. In the second example, Gulf Oil Co., Contract DLA600-81-D-0445[3], page 8, proposed the use of its own sales prices for gasoline and jet fuel in a 50 percent – 50 percent ratio.

[3] The Gulf Oil contract was Exhibit A of a November 3, 2003, filing by plaintiff in Flint Hills Resources, LP v. United States, Fed Cl. No. 02-0462C.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 22 March 2006

LAWRENCE C. ERVIN

# AWARD/CONTRACT

DARS FORM 26, JULY 1966 / PAGE 1 OF 14

| | |
|---|---|
| CONTRACT (Proc. Inst. Ident.) NO. | ..A600-81-D-0354 |
| 3. EFFECTIVE DATE | 80 OCT 31 |
| 4. REQUISITION/PURCHASE REQUEST/PROJECT NO. | SEE RFP FILE FOR CONSOLIDATED PRs |
| 5. CERTIFIED FOR NATIONAL DEFENSE UNDER BDSA REG. 2 AND/OR DMS REG. 1. RATING: | |
| ISSUED BY / CODE | SC0600 |
| | DEFENSE FUEL SUPPLY CENTER<br>CAMERON STATION TWX 710-832-0600<br>ALEXANDRIA, VIRGINIA 22314 2.2a/2.2d<br>ATTN: S. ALLEN/DFSC-PD/47453 |
| 6. ADMINISTERED BY (If other than block 5) / CODE | PRE-AWARD SURVEY - NONE |
| 7. DELIVERY | ☐ FOB DESTINATION ☒ OTHER (See below) SEE SCHEDULE |
| CONTRACTOR NAME AND ADDRESS (Street, city, county, State, and ZIP code) / CODE | 81355<br>ASHLAND PETROLEUM COMPANY<br>1409 WINCHESTER AVENUE<br>ASHLAND, KY 41101 |
| FACILITY CODE | |
| 9. DISCOUNT FOR PROMPT PAYMENT | NET 30 DAYS |
| 10. SUBMIT INVOICES (4 copies unless otherwise specified) TO ADDRESS SHOWN IN BLOCK | SEE BLOCK 12 |
| SHIP TO/MARK FOR / CODE | SEE SCHEDULE |
| 12. PAYMENT WILL BE MADE BY / CODE | SP4900<br>DEFENSE FUEL SUPPLY CENTER<br>CAMERON STATION, BUILDING 5<br>ATTN: DFSC-CDX<br>ALEXANDRIA, VIRGINIA 22314 |
| THIS PROCUREMENT WAS ☐ ADVERTISED, ☒ NEGOTIATED, PURSUANT TO: | ☒ 10 U.S.C. 2304 (a)(10)<br>☐ 41 U.S.C. 252 (c)( ) |
| ACCOUNTING AND APPROPRIATION DATA | SEE CLAUSE L150 |

| 15. ITEM NO. | 16. SUPPLIES/SERVICES | 17. QUANTITY | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|
| | (a) This document confirms and incorporates by reference Award wire dated 31 Oct 80.<br><br>(b) A copy of Clause E12 (Contract Schedule) and various other clauses agreed to by the parties are attached hereto for informational purposes. In addition, pages 1 through 6 and 102 through 139 of RFP DLA600-80-R-0161 dated 80 May 29 and Amendments 0001 - 0008 are also attached for convenience and informational purposes. The following clauses are deleted: E19.03, L94, L97, L176, L176.01, L176.03. | | | | |

Estimated TOTAL AMOUNT OF CONTRACT $ 146,829,719

*CONTRACTING OFFICER WILL COMPLETE BLOCK 22 OR 26 AS APPLICABLE.*

22. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return 2 copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

26. ☐ AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number ______, including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

| | |
|---|---|
| NAME OF CONTRACTOR<br>BY *Foy H. Wade*<br>(Signature of person authorized to sign) | 27. UNITED STATES OF AMERICA<br>BY *John D. Hilliard*<br>(Signature of Contracting Officer) |
| NAME AND TITLE OF SIGNER (Type or print): *Foy H. Wade, Manager Aviation Fuels Division* | 28. NAME OF CONTRACTING OFFICER (Type or print): JOHN D. HILLIARD |
| 25. DATE SIGNED: *11/24/80* | 29. DATE SIGNED: 03 DEC 1980 |

SCHEDULE DLA600-81-D-0354

SUPPLIES –

E12 SUPPLIES TO BE FURNISHED (DFSC 1988 MAY)

(A) The supplies to be furnished hereunder, F.O.B. delivery points, method of delivery and estimated quantities are as follows.

a(B) Prices indicated hereunder are subject to Clause E19.12, ECONOMIC PRICE ADJUSTMENT

| ITEM NUMBER | ESTIMATED QUANTITY GALS | METHOD OF DELIVERY | UNIT PRICE W/FSII |
|---|---|---|---|
| | DFSC | JP-4 | NSN 9130-00-256-8613 |
| 0101 | 31,400,000 | B | $.84790 |
| FOB Origin delivery of 31,400,000 gallons at Ashland, KY. | | | |
| 0201 | 41,469,632 | B | $.84790 |
| FOB Origin delivery of 41,469,632 gallons at Buffalo, NY. | | | |
| 0301 | 30,000,000 | P | $.90190 W/O FSII |
| FOB Origin delivery of 30,000,000 gallons at St. Paul Park, MN. | | | |
| 0401 | 1,100,000 | TT | $.87210 |
| Destination delivery of 1,100,000 gallons to Youngstown, MA. | | | |
| 0501 | 4,680,000 | B | $.85720 |
| Destination delivery of 4,680,000 gallons to DFSP Cincinnati, OH. | | | |
| 0601 | 7,640,000 | P | $.86130 |
| Destination delivery of 7,640,000 gallons to Rickenbacker AFB, OH. | | | |
| 0701 | 2,000,000 | TT | $.87350 |
| FOB Destination delivery of 2,000,000 gallons to Manfield, MA OH. | | | |
| 0801 | 8,000,000 | P | $.86440 |
| Destination delivery of 8,000,000 gallons to Wright Patterson AFB, OH. | | | |
| 0901 | 240,000 | TT | $.88720 |
| Destination delivery of 240,000 gallons to ONG Akron, Canton, OH. (Requires truck equipped with pump). | | | |
| 1001 | 4,200,000 | TT | $.85760 |
| Destination delivery of 4,200,000 gallons to Shewmaker Field, Louisville, KY. | | | |

A600-81-D-0354

| ITEM NUMBER | ESTIMATED QUANTITY GALS | METHOD OF DELIVERY | UNIT PRICE |
|---|---|---|---|
| | DFSC | JP-4 | NSN 9130-00-256-8613 |
| 1101 | 600,000 | TT | $.86380 |
| Destination delivery of 600,000 gallons to Fort Knox, KY. | | | |
| 1201 | 180,000 | TT | $.86420 |
| Destination delivery of 180,000 gallons to Kentucky NG Frankfort, KY. | | | |
| 1301 | 9,000,000 | TT | $.86880 |
| Destination delivery of 9,000,000 gallons to Greater Pittsburg Apt, PA. | | | |
| 1401 | 1,800,000 | TT | $.93530 |
| Destination delivery of 1,800,000 gallons to Kanawha Co. Arpt. Charleston, W. VA. | | | |
| 1501 | 130,000 | TT | $.91160 |
| Destination delivery of 130,000 gallons to West Virginia Air National Guard Parkersburg, W. VA. | | | |
| 1601 | 6,200,000 | TT | $.86010 |
| Destination delivery of 6,200,000 gallons to Niagara Falls International Airport, N.Y. | | | |
| 1701 | 500,000 | TT | $.89340 |
| FOB Destination delivery of 500,000 gallons to NASA Lewis Res Ctr, Cleveland,MA, OH. | | | |
| 1801 | 4,200,000 | TT | $.89470 |
| FOB Destination delivery of 4,200,000 gallons to Hulman Field, Terre Haute, IN. | | | |
| 1901 | 3,110,000 | TT | $.88590 |
| FOB Destination delivery of 3,110,000 gallons to Allison Dev. GMC, Indianapolis, IN. | | | |
| 2001 | 9,500,000 | TT | $.89540 |
| FOB Destination delivery of 9,500,000 gallons to Ft. Campbell, KY. | | | |

DLA600-81-D-0354

| ITEM NUMBER | ESTIMATED QUANTITY GALS | METHOD OF DELIVERY | UNIT PRICE |
|---|---|---|---|
| | DFSC | JP-5 | NSN 9130-00-273-2379 |
| 2101 | 15,000 | TT | $ .96657 |

Destination delivery of 15,000 gallons to Wright-Patterson AFB

| | | | |
|---|---|---|---|
| 2201 | 1,980,000 | TT | $.92260 |

Destination delivery of 1,980,000 gallons to G. F. Evandale

| | | | |
|---|---|---|---|
| 2301 | 864,000 | TT | $.94414 |

Destination delivery of 864,000 gallons to GE Peebles, OH

| | | | |
|---|---|---|---|
| 2401 | 200,000 | TT | $.94708 |

Destination delivery of 200,000 gallons to Allison DIV GMC, Indianapolis, IN

| | | | |
|---|---|---|---|
| 2501 | 20,000 | TT | $.90900 |

Origin delivery of 20,000 gallons at Covington, KY

NOTES: 1. The Small Business, Labor Surplus Area and Small Disadvantaged Minority Business Concerns Subcontracting Program Clauses in this contract will be administered by the cognizant Defense Contract Administration Services Region, which is:

DCASR Cleveland
A. J. Celebreeze Federal Bldg.
1240 E. 9th Street
Cleveland, OH 44199

2. JP-5 supplied under this contract will have a minimum flash point of 130 degrees Fahrenheit and a freeze point of -44° Fahrenheit.

3. Unless the parties agree otherwise, the minimum/maximum quantities for individual deliveries shall be as follows:

| PRODUCT | M.O.D. | SHIPPING POINT | MINIMUM | MAXIMUM |
|---|---|---|---|---|
| JP-4. | B | Catlettsburg, KY | NONE | 20,000 bbls each with 5 days reblending between barges |
| JP-4 | P | Columbus, OH | 300,000* gallons | NONE |
| JP-4 | P | Medway, OH | 300,000* gallons | NONE |

*Unless mutually agreed by Ashland representative.

4. The term barge used above shall include lake tanker.

DLA600-81-D-0354

5. The quantity shown in the schedule is for the first program year. The ordering period shall be Date of Award through 30 Sep 81. Deliveries against item 0301 shall not begin for 6 to 8 weeks unless by mutual agreement.

The quantity applicable for the second through fifth program years in accordance with Clause H1.08.200, Deliveries and Contract Periods (DFSC 1980 APR) for each line item shall be the same.

6. Line item 2101 shall have a minimum flash point of 135 degrees Fahrenheit. The delivery dates against this item shall be by mutual agreement of the parties.

7. Reference Clause L171, Subcontracting Plan for Small Business and Small Disadvantaged Business Concerns (1979 JUL). The negotiated subcontracting plan as submitted by Ashland Petroleum Co. by letter dated 10 October 1980 is hereby incorporated and made a part of the contract. (See Attachment A).

E19.12 ECONOMIC PRICE ADJUSTMENT (DFSC 1980 MAY)

The Contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of increase in the published or posted prices referenced in the Contractor's bid or proposal.

PART A

As used throughout this Section:

(a) The term "listed items" means the items of Section E of the Schedule that are listed in the Reference Price Tabulation of Part C of this Section and are the only items to which escalation shall apply, unless otherwise provided in the contract schedule.

(b) The term "base price" means the unit price set forth opposite the item in Section E of the Schedule.

(c) The term "reference price" means the price set forth in this Section with which the base price is to fluctuate.

(d) The term "date of delivery" means

(i) the date and time vessel begins to load where contract calls for delivery at origin into tanker or barge;

(ii) the date and time vessel begins to discharge where contract calls for delivery at destination by tanker or barge;

(iii) the date and time product commences to move past the specified f.o.b. point where contract calls for delivery into storage by pipeline;

(iv) the date product is received for all methods of delivery other than (i), (ii), and (iii) above.

PART B

(a) The Contractor shall notify the Contracting Officer, Defense Fuel Supply Center, Cameron Station, Alexandria, Va., 22314 of any change in the reference price by telegram dated (preferably confirmed promptly by letter), registered letter mailed, or unregistered letter received, within fourteen (14) days from the date thereof.

(i) In the event the Contractor fails to notify the Contracting Officer of any increase in reference price, such increase shall apply only to deliveries made on and after the date of receipt by the Contracting Officer of a written notification from the Contractor of such increase.

(ii) In the event the Contractor fails to give notice of a decrease in the reference price, such decrease shall apply to all deliveries made on or subsequent to the date of such decrease.

(iii) The Contracting Officer will issue a Change Order to this contract to reflect any change pursuant to this Section.

(b) Notwithstanding any provision of this Section to the contrary, the prices payable under this contract shall in no event exceed any of the following:

(i) the Contractor's legal prices under the Federal Energy Administration's Mandatory Petroleum Price Regulations, if applicable.

(c) In the event the reference price product is not subject to Department of Energy price control, Contractor warrants as follows:

(i) The prices to be invoiced hereunder for listed items shall be computed in accordance with these economic price adjustment provisions:

(ii) During the term of this contract, substantial sales to non-government customers of the reference price product are made by Contractor at prices which move directly with the posted reference price.

(iii) During the term of this contract, each change in reference price furnished under this economic price adjustment clause will be reflected in corresponding price changes in sale of the reference price product to non-government customers except where constrained by contract.

(d) In the event the reference price product is subject to Department of Energy price controls, Contractor warrants as follows:

E19.12 (Cont'd)

(i) The prices to be invoiced hereunder for listed items shall be computed in accordance with these economic price adjustment provisions.

(ii) The reference price is a price posted by Contractor for a product which, as of the contract award date, is subject to Mandatory Price and Allocation controls under regulations issued by the Department of Energy (DOE) (10 Code of Federal Regulations, Parts 210, 211, 212).

(iii) During the term of this contract, while DOE Mandatory Price and Allocation controls are in effect, sustantial sales to non-government customers of the reference price product are made by Contractor at prices which move directly with the posted reference price.

(iv) Any change in the reference price furnished for the purpose of economic price adjustment hereunder will not exceed contractor's maximum allowable price for the reference price product under DOE Mandatory Petroleum Price Regulation.

(v) During the term of this contract, while DOE Mandatory Price and Allocation controls are in effect, each change in reference price furnished under this economic price adjustment clause will be reflected in corresponding price changes in sales by the reference price product to non-government customers except where constrained by contract.

(e) In connection with the warranties in (c) and (d) above, Contractor agrees that the Contracting Officer or his designated representative, who are employees of the U.S. Government, shall have the right to examine books, records, documents, and other data of the Contractor as may be required to verify Contractor's compliance.

(f) The Contractor shall have the right to appeal under the Clause entitled "Disputes" from any determination made by the Contracting Officer under this Clause.

(g) No change in contract price shall be processed under this clause until verification of posting change has been received by the Contracting Officer.

(h) In the event the reference price is discontinued, or its method of calculation is altered substantially, the parties shall mutually agree upon an appropriate and comparable substitute for determining the price adjustment described herein. This contract shall be amended to reflect such substitute reference price, effective on the date prior reference price is discontinued or altered. In the event the parties fail to agree on an appropriate substitute, the matter shall be resolved in accordance with the Disputes clause of the contract.

(i) Notwithstanding any other provision of the clause, no upward adjustment shall apply to supplies which are required to be delivered prior to the effective date of the adjustment unless the Contractor's failure to deliver in accordance with the delivery schedule arises from causes beyond the control and without the fault or negligence of the Contractor within the meaning of the clause of this contract entitled "Default", in which case the contract shall be amended to make an equitable extension of the delivery schedule.

PART C

(a) The prices payable under this contract for listed items shall be the base price for the listed item increased or decreased by the amount, determined according to the formula in paragraph (b) below, that the reference price for the listed item shall have been increased or decreased to and including the date of delivery.

(b) The amount of increase or decrease in the base price shall be
(check appropriate box and complete applicable blanks)

[X] the same number of cents, or fractions thereof, that the reference price increases or decreases per like unit of measure.

[ ] the number of cents, or fractions thereof, determined by the ratio of $_______ per gallon for each $_______ per barrel that the reference price increases or decreases.

[ ] the number of cents, or fractions thereof, at the rate of $_________ per gallon for each full $_________ per barrel that the reference price increases or decreases.

(c) The reference price with which the base price for the item is to fluctuate and which is more fully defined in the tabulation to follow) is
(check appropriate box and complete applicable blanks)

[X] price posted by

[ ] the average of the prices posted by

DLA600-81-D-0354

E19.12 (Cont'd)

| | |
|---|---|
| Ashland Petroleum Co. (name of company) | (name of company) |
| (name of company) | (name of company) |
| (name of company) | (name of company) |

(The name of the company or companies posting the reference price shall be identified in Column II of the following tabulation by the number appearing opposite the name of the company(s)).

| I ITEM NO. (LISTED ITEMS) | II NAME OF COMPANY(S) | III COMPANY NAME OF PRODUCT | IV LOCATION WHERE POSTED PRICE IS APPLICABLE | V METHOD OF DELIVERY APPLICABLE TO THE POSTED PRICE | VI POSTED PRICE PAY AS OF 10-31-80 | VII MAXIMUM PRICE PAYABLE UNDER CONTRACT ** |
|---|---|---|---|---|---|---|
| 0101-0201 0401-2001 | Ashland | Reg Gas (60%) Kerosene (40%) | Catlettsburg, KY for Ohio Shipments | TT | $.9215 $.8910 | See Clause E19.09 |

Base reference price calculated as follows:

60% $.9215 + 40% $.8910 = $.9093 Base Reference Price

| | | | | | | |
|---|---|---|---|---|---|---|
| 0301 | Ashland | Reg Gas (60%) Kerosene(40%) | St. Paul Park | TT | $.925 $.91 | |

Base Reference Price calculated as follows:

60% $.925 + 40% $.91 = $.919 Base Reference Price

| | | | | | | |
|---|---|---|---|---|---|---|
| 2101-2501 | Ashland | Kerosene | Louisville | TT | $.889 Base Reference Price | |

*EXCLUDES ALL TAXES
**INCLUDING ANY TAX INCLUDED IN THE BASE PRICE

E19.09 UPWARD CEILINGS ON ECONOMIC PRICE ADJUSTMENT/PRICE ESCALATION (DFSC 1979 MAR)

Contractor agrees that the total increase in any unit price pursuant to the Economic Price Adjustment/Price Escalation provision of this contract shall not exceed 50 percent of the original base price for individual contract items, except in the situations provided hereafter.

1. If at any time the contractor has reason to believe that within the near future a price adjustment will be required under the Economic Price Adjustment/Price Escalation provision of this contract and that the resultant adjustment when added to the latest contract price for the item(s) in question will exceed the current contract ceiling price for the item(s), the contractor shall notify the Contracting Officer of the expected increase. At the same time, the contractor shall propose a revised ceiling which it believes to be sufficient to permit completion of remaining contract performance. Contractor's proposal shall be supported by appropriate explanations and documentation. The parties agree to promptly undertake negotiations regarding the proposed new ceiling.

2. If, in the absence of an agreement on a new ceiling, notice is given by the contractor of an actual price change which results in a unit price for contract item(s) which exceeds the current ceiling, the contractor will have no further obligation under this contract to fill pending or future orders for the specific line item(s) in question as of the effective date of the increase, as long as the unit price exceeds the ceiling. If, however, notwithstanding the lack of agreement on a new ceiling, the Contracting Officer indicates in writing that the Government is prepared to purchase the line item(s) for the price as adjusted under the Economic Price Adjustment/Price Escalation provisions beyond the current ceiling, the contractor will be obligated to continue to honor orders placed for the specific line item in question.

DLA600-81-D-0354

E19.01 FREIGHT RATE ADJUSTMENTS (DESC 1978 MAY)

(a) In the event that a change occurs in any freight rate identified below, the price for the item affected by such change in freight rate shall be increased or decreased by the same number of cents or fractions thereof per line unit or [illegible] such freight rate is increased or decreased, notwithstanding any [illegible] price provision in this contract to the contrary. There shall be no change in price for any item delivered prior to the effective date of any change in freight rates.

(b) The term "freight rate", as used herein, means the common carrier freight rate between the final shipping point and the delivery point for the item [illegible] in the Schedule.

(c) The Contractor shall notify the Contracting Officer, Defense Fuel Supply Center, Cameron Station, Alexandria, Va., 22314, in writing, of any change in the freight rate by telegram dated, registered letter mailed, or unregistered letter received, within fourteen (14) days from the date thereof.

(i) In the event the Contractor fails to notify the Contracting Officer of any increase in freight rate, such increase shall apply only to deliveries made on or after the date of receipt by the Contracting Officer of a written notification from the Contracter of such increase.

(ii) In the event the Contracter fails to give notice of a decrease in freight rate, such decrease shall apply to all deliveries made on or subsequent to the date of such decrease.

(iii) The Contracting Officer will promptly issue a modification to this contract to reflect any change in rate, provided, however, that with respect to increase, Contractor has furnished sufficient documentation to permit the Contracting Officer to verify such increases.

(d) The items to which this Section applies and the applicable tariffs are as follows:

| ITEM NOS. | BASE FREIGHT RATES | TARIFF OR TENDER | FRT. RATE W/FUEL SURCHARGE | PUBLISHED BY |
|---|---|---|---|---|
| 0401 | $.0214 | BCC 2006 B, Sect. 2 | $.0242 (13%) | Bulk Carriers |
| 0501 | $.0093 | Ashland Petroleum Co. | | |
| 0601 | $.0036 | | | Oh. River Pipeline Co. |
| 0701 | $.0256 | Item 415 | None | Ray Molder Cont. |
| 0801 | $.0026 | | | Sohio Pipeline Co |
| 0901 | $.0337 | BCC 2006 B, Sect. 2 | $.0393 (13%) Also includes pump charge) | Bulk Carriers |
| 1001 | $.0086 | KTCC 5, Item 345 | $.0097 (13%) | Kentucky Bulk |
| 1101 | $.0141 | KTCC 5, Item 345 | $.0159 (13%) | Carriers Conf. |
| 1201 | $.0144 | KTCC 5, Item 345 | $.0163 (13%) | |
| 1301 | $.0209 | PA. 4, Sect. 1B | None | PA Carriers |
| 1401 | $.0773 | BCC 2004 A, Sect. 4 | $.0874 (13%) | Bulk Carriers |
| 1501 | $.0564 | BCC 2004 A, Sect. 4 | $.0637 (13%) | " |
| 1601 | $.0114 | BCCNY-7, Item 1530 | $.0122 (7%) | " |
| 1701 | $.0403 | BCC 2006 B, Sect. 2 | $.0455 (13%) | " |
| 1801 | $.0414 | BCC 2001, Item 1090 | $.0468 (13%) | " |
| 1901 | $.0336 | BCC 2001, Item 1090 | $.0380 (13%) | " |
| 2001 | $.0420 | KTCC5, Item 345 | $.047 (13%) | Kentucky Bulk |
| 2101 | $.0244 | BCC 2001, Sect. 2 | $.02757(13%) | Bulk Carriers |
| 2201 | $.0120 | BCC 2001, Sect. 2 | $.01356(13%) | Bulk Carriers |
| 2301 | $.0311 | BCC 2001, Item 1100 | $.03514(13%) | " |
| 2401 | $.0337 | BCC 2001, Item 1080 | $.03808(13%) | " |

ID.02 TRANSPORT TRUCKS AND TRUCK AND TRAILER FREE TIME AND DETENTION RATES (DFSC 1979 MAY)

Upon arrival of Contractors transport truck or truck and trailer, the receiving activity shall promptly designate the tanks into which the load is to be discharged. Free time will commence at the time the discharge hose is connected to fill pipe at the delivery point specified, and will end when discharge is completed. For items involving multiple drops, time between drops will not be included in free time. Contractor shall be paid for detention beyond free time for delays caused by the Government. A minimum of one hour free time is required. Rate for detention shall be comparable to regulated tariffs governing the local area of receiving activity.

(a) Free time for unloading transport truck or truck and trailer: 1-1/2 hours

(b) Rate for detention beyond the free time: $6.25 per each 15 minutes.

The above will not be considered in the evaluation of offers for award, except that free time of less than one hour or detention rates not comparable to regulated tariffs may render an offer unacceptable/bid nonresponsive.

UNLESS OFFEROR INDICATES OTHERWISE, FREE TIME WILL BE CONSIDERED UNLIMITED.

I14.200 INSPECTION AND ACCEPTANCE (DESC 1979 NOV)

On deliveries F.O.B. origin, acceptance of the supplies furnished hereunder will take place at origin notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. On deliveries F.O.B. destination, acceptance of the supplies furnished hereunder will take place at destination notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. The office responsible for inspection, in behalf of the Government, shall be as follows:

| ITEM(S) | SOURCE OF PRODUCT AND/OR SHIPPING POINT | INSPECTOR(S) |
|---|---|---|
| 0201, 1601 | Ashland Petroleum Co.<br>Station B, Box F<br>Buffalo, Erie Co., N.Y. 14207<br>(285 Employees) | DCASMA Syracuse<br>U.S. Courthouse and Fed. Bldg.<br>100 S. Clinton Street<br>Syracuse, NY 13260 |
| 0401, 1701, 0901<br>1301, 1401, 1501 | Ashland Petroleum Co.<br>Freedom, Beaver Co. PA 15042<br>(130 Employees) | DCASMA Pittsburgh<br>1610 - S. Federal Building<br>1000 Liberty Ave<br>Pittsburgh, PA. 15222 |
| 0701 | Ashland Petroleum Co.<br>Glessner Avenue<br>Findlay, Hancock Co. OH 45840 | DCASMA Dayton<br>% Defense, Electronics Supply Center Bldg 1<br>Dayton, OH. 45444 |
| 0601 | Ashland Petroleum Co.<br>3855 Fisher Road<br>Columbus, OH 43228 | DCASMA Dayton<br>% Defense, Electronics Supply Center Bldg 1<br>Dayton, OH. 45444 |
| 0801 | Ashland Petroleum Co.<br>Midway Terminal<br>4741 Osborn Road<br>Midway, OH. 45341 | DCASMA Dayton<br>% Defense, Electronics Supply Center Bldg 1<br>Dayton, OH. 45444 |
| 0301 | Ashland Petroleum Co.<br>St. Paul Park, MN. | DCASMA Twin Cities<br>2305 Ford Parkway<br>St. Paul, MN. 55116 |
| 0101, 0501 | Ashland Petroleum Co.<br>1409 Winchester Avenue<br>Ashland, Boyd Co. KY. 41101<br>(750 Employees) | DCASMA Cincinnati<br>Federal Bldg.<br>550 Main Street<br>Cincinnati, OH. 45202 |

DLA600-81-D-0354

I14.200 INSPECTION AND ACCEPTANCE (DFSC 1979 NOV) (Cont'd)

| ITEM(S) | SOURCE OF PRODUCT AND/OR SHIPPING POINT | INSPECTOR(S) |
|---|---|---|
| 1801, 1901, 1001<br>2001, 1101, 1201 | Ashland Petroleum Co.<br>4510 Algonguin Parkway<br>Louisville, Jefferson<br>Co., KY 40211<br>(110 Employees) | DCASMA Cincinnati<br>Federal Bldg.<br>550 Main Street<br>Cincinnati, OH. 45202 |
| 2101, 2201, 2301<br>2401, 2501 | Ashland Petroleum Co.<br>30th & James Streets<br>Latonia Station<br>Covington, KY. 41015 | DCASMA Cincinnati<br>Federal Bldg.<br>550 Main Street<br>Cincinnati, OH. 45202 |

L150 PREPARATION AND SUBMISSION OF INVOICES (DFSC 1978 NOV)

(a) ORDERS BY THE DEPARTMENT OF DEFENSE

(i) PAYING OFFICE:

(A) Orders placed by the Defense Fuel Supply Center or its designee as shown on Source Identification and Ordering Authorization (SIOATH) Forms - Invoices for Product payable against Defense Logistics Agency (Defense Fuel Supply Center) funds as cited on the Order for Supplies or Services, DD Form 1155, will be paid by the Defense Logistics Agency Administrative Support Center by mailing invoices to:

Defense Fuel Supply Center
ATTN: DFSC-CDX
Cameron Station, Bldg. 5
Alexandria, Virginia 22314

(B) ORDERS PLACED BY OTHER DEPARTMENT OF DEFENSE ACTIVITIES—Invoices shall be forwarded to the applicable Paying Office in accordance with instructions contained on the order.

(ii) SUBMISSION OF INVOICES AND CERTIFICATION OF RECEIPT

(A) Invoices submitted for payment shall be submitted in quadruplicate and shall contain the contract number, order number, name of tanker and cargo number, item number, contract description of supplies or services, sizes, quantities, unit prices, extended total, and if shipment is made on Government Bill of Lading, Bill of Lading number.

(B) CERTIFICATION OF RECEIPT

(1) F.O.B. DESTINATION DELIVERIES—For orders placed by the Defense Fuel Supply Center or its designee the consignee will certify Material Inspection and Receiving Report, DD Form 250 or DD Form 250-1 as applicable, and forward four copies (one of which will contain an original signature) to the payment office specified in paragraph (a)(i)(A) above. The signed copy will have the following information stamped, printed or typed on it: ORIGINAL RECEIVING REPORT FOR PAYMENT OF INVOICE.

For all other orders the consignee will certify Material Inspection and Receiving Report, DD Form 250 or DD Form 250-1 as applicable, and forward two copies to the appropriate paying office.

In either situation above if the consignee is not a U.S. organization, the authorized U.S. representative as indicated in the Source Identification and Ordering Authorization will certify the DD Form 250 or 250-1.

(2) F.O.B. ORIGIN DELIVERIES—For orders placed by the Defense Fuel Supply Center or its designee the Contractor shall support each invoice for payment with four copies (one of which will contain an original signature) of the Material Inspection and Receiving Report, DD Form 250 or DD Form 250-1 as applicable. The signed copy will have the following information stamped, printed or typed on it: ORIGINAL RECEIVING REPORT FOR PAYMENT OF INVOICE. The Material Inspection and Receiving Reports will be signed by the Quality Assurance Representative to certify acceptance of the product prior to submission of the invoices. These supporting documents will be mailed, with the invoice to the payment office specified in paragraph (a)(i)(A) above.

For all other orders the Contractor shall support each invoice with two copies of Material Inspection and Receiving Report, DD Form 250 or DD Form 250-1 as applicable.

The Material Inspection and Receiving Reports will be signed by the Quality Assurance Representative to certify acceptance of the product prior to submission with invoices. Duplicate signatures are acceptable.

(b) ORDERS BY OTHER FEDERAL AGENCIES—On orders placed by activities of Federal Departments, other than the Dept. of Defense, invoices shall be submitted as instructed by those activities. Such activities placing orders under this contract shall furnish the Contractor with the name and proper address of the activity to whom invoices shall be rendered and the name and address of the Disbursing Officer responsible for payment. Such activities shall also indicate the procedure for processing tax exemption certificates.

(c) CLASSIFIED CONTRACTS—To prevent disclosure of classified information, invoices submitted under classified contracts shall be so prepared that the supplies or services covered thereby can be identified only by reference to the contract. For example, the invoices may state "Contract DLA600———————. Item 2, -000 at $0.15 - $750,000". The security classification shown on the contract shall not appear on the invoices.

(d) PAYMENT—Unless expressly otherwise specified in the Schedule, payment of invoices will be made in United States currency.